## CURRY et ux. v. TEXAS CO. (No. 557.)

Court of Civil Appeals of Texas. Eastland.
March 22, 1929.

Rehearing Denied May 17, 1929. Further Rehearing Denied June 14, 1929.

Hawkins & David, of Breckenridge, and Preston Martin, of Weatherford, for appellants.

H. S. Garrett, of Fort Worth, and Goggans & Allison, of Breckenridge, for appellee.

FUNDERBURK, J. The trial court having sustained six special exceptions to plaintiffs' petition and plaintiffs having declined to amend, the suit was dismissed. From the judgment of dismissal, plaintiffs J. C. Curry and wife have appealed. Appellants challenge the correctness of the action of the trial court in sustaining each of the special exceptions, and appellee, by cross-assignment, insists that the trial court erred in overruling still another of its special exceptions.

The pleading in question (plaintiffs' third amended original petition, filed September 10, 1928) shows that the plaintiffs, being the owners of 989 acres of land in Stephens county, on August 23, 1911, for a valuable consideration, executed and delivered to appellee an oil and gas lease covering said land. The provisions of the lease are not alleged further than that the lease bore the above date, was for a term of seven years from its date, "unless extended by drilling operations or by production of minerals thereunder," and expressly granted to appellee the exclusive privilege of developing said land for oil and gas, and was duly of record in volume 40, pp. 19–23, of the deed records of said county.

It was alleged that, prior to the expiration of the primary term of the lease, oil or gas, or both, were discovered in paying quantities; that the lease was valid and subsisting at the date of the filing of suit; and that oil and gas had been continuously produced from the time of discovery and was still being produced at the time of the filing of the amended petition. It was further alleged that "on October 19, 1925, for a valuable consideration to each of the parties thereto then moving," plaintiffs and defendant entered into a contract in writing called "drilling agreement," which, after reciting the making of the lease above mentioned and book and page where recorded, and briefly describing the land covered by the lease, and reciting that the agreement covered all said land except the S. W. one fourth of section 25, was as follows:

"We, and each of us, whose names are signed hereto, being owners of certain interest under said lease, do jointly and severally agree with The Texas Company as follows:

"The royalty on gas, whether from oil wells or gas wells, including casinghead gas, payable under said lease, shall be 1/8 of the market value of the gas at the well for all gas used, but where said gas is not used, but is sold to others, the royalty shall be 1/8 of the gross proceeds resulting from such sale, including the proceeds from the sale of residue gas. However, this rate of payment of royalty shall not take effect until The Texas Company, its successors or assigns, has drilled the three first wells herein mentioned. The consideration moving from the Texas Company to the other parties hereto is that The Texas Company binds and obligates itself, its successors and assigns, to begin operations each year for the drilling of three wells upon some part of the land covered by the lease, except the South 1/2 of said section 25, the location of wells to be selected by The Texas Company. When a well is begun the same shall be continued with reasonable diligence to completion, and by completion is meant the depth at which oil or gas is usually found in the vicinity, unless oil or gas in paying quantities is discovered at a less depth.

"The failure to begin operations for the drilling of any one of the three wells provided for above in any one year shall immediately forfeit all of the lands covered by said lease, except ten acres as nearly in the form of a square as practicable to be selected by lessee, around each well which has been drilled or may be drilling at the time. This forfeiture, however, shall not apply to the South 1/2 of said Section 25, nor to the forty acres in the form of a square out of the Southwest corner of Section No. 3391, T. E. & L. Co. Survey, heretofore assigned by The Texas Company to G. O. Bateman. The beginning of operations for the first well of the first three wells shall be January 15, 1926. However, should a well be begun prior to that time, then the date of the beginning of such well shall be the date from which to compute the first year. While The Texas Company is obligated to begin three wells each year, should however it, its successors or assigns, begin more than three wells during any year the excess over the three shall count as a well or wells for one succeeding year or years.

"In addition to the three wells per year mentioned above, The Texas Company, its successors or assigns, has the option of drilling one well only during the first drilling year of this agreement on the 29.5 acres in the Northeast 1/4 of said Sec. 25. Should it fail to drill said one well on said 29.5 acres during said first year, it will surrender said 29.5 acres and release the same from said lease. The Texas Company, its successors or assigns, shall not store or pro rate royalty oil, but will pay for all royalty oil received by it from said lease.

"Executed this the 19 day of October, 1925. The Texas Company, by A. H. Culver, Chief of Division of Lands and Leases. J. C. Curry. E. E. Curry.

"Attest: J. B. Duke, Assistant Secretary [Corporate Seal]."

It was further alleged that under said agreement three wells were drilled during the "first drilling year" and one well during the "second drilling year," and that no more wells had been begun. The reasonable cost of drilling wells was alleged to be $35,000 per well, and that defendant had defaulted in its drilling obligations to the extent of five

wells, for which damages were claimed in the sum of $200,000, with legal interest from a specified date.

We will consider first the questions involving special exceptions 2, 3, and 4, 2 and 3 being presented by assignments of appellants and 4 by cross-assignment of appellee. The first question involves the correctness of the action of the trial court in sustaining appellee's special exception No. 2, by which it was determined, in effect, that, as a matter of law, the contract sued on was terminable at the will of appellee or its assignee. The next question arises upon the action of the court in sustaining appellee's special exception No. 3, by which the trial court, in effect, determined that the provision in the agreement of October 19, 1925, that "the failure to begin operations for the drilling of any one of the three wells provided for above in any one year shall immediately forfeit all of the lands covered by said lease except," etc., constitutes a self-operating forfeiture stipulation and names the damages which shall result from a failure to drill.

The question raised by appellee's cross-assignment is whether the trial court erred in overruling appellee's special exception No. 4, by which action the court refused to hold, as contended by appellee, that the forfeiture provided in the agreement of October 19, 1925, by reason of the agreement being but a modification of the lease of August 23, 1911, thereby became a limitation on the estate granted by said lease, and, upon failure to drill, the lease (with the exception mentioned in the subsequent agreement) terminated by reason of such limitation.

■ We believe that the agreement of October 19, 1925, for the breach of which damages are claimed, must be construed as a modification of the lease of August 23, 1911. With only the meager information furnished by the allegations of the petition as to the provisions of the lease, it seems sufficiently certain that the later agreement covers, to some extent, the same subject-matter in such a way as to effect some modification of the terms of the lease. If the later agreement was but a modification of the provisions of the lease, then it was an extremely hazardous proceeding for the trial court, and would be for us, to attempt to construe particular provisions of the agreement in the absence of full information as to the terms of the lease. Plaintiffs had the right, as they have done, to plead their cause of action, based alone on the agreement made subsequent to the lease. It may be that the provisions of the lease not appearing in the agreement will, upon the trial, greatly influence, and possibly defeat, recovery, but, if so, the matter cannot be reached by means of exceptions, either general or special, to the pleading. This results from the rule that a plaintiff need not set out all the terms of a contract sued on, but if this is not done and when the contract is offered in evidence there appears provisions which modify or require a different construction to be placed upon those declared upon, recovery may be defeated. We had occasion to consider a somewhat analogous situation in the case of Automobile Insurance Co. v. Bridges (Tex. Civ. App.) 5 S.W.(2d) 244.

■■ A good illustration of this point may be mentioned, which, at the same time, will dispose of the contention that the pleading was subject to one exception urged because of the want of any limit to the obligation to drill three wells each year. If the agreement be but a modification of the lease, the term or time during which the drilling obligation will remain in force may well be expected to be found in the provisions of the lease. Certainly the allegations of the petition do not affirmatively show that no such limitation is to be found therein. If it does exist, then the drilling obligation cannot properly be construed as being an obligation terminable at the will of either party. The question presented is one not to be determined upon an exception to the pleading, because the pleading does not disclose that the obligation was not to remain in force for some definite time, or for some time capable of being made definite. Presumably, the lease was limited in its term of duration. We do not mean to suggest, however, that, if the lease is one the term of which is limited by some uncertain contingency that may permit it to endure forever, that the drilling obligation would continue until the term of the lease ended. Without undertaking to pass upon the question here, we merely suggest that if the provision, as it appears to be, is one providing in advance what shall constitute a reasonable development of the lease, then when the lease is reasonably developed the obligation would end. We think the trial court erred in sustaining this exception.

In this connection appellee insists, as a part of its cross-assignment, that the lease granted a determinable fee in the land. We do not believe that sufficient allegations are made as to the provisions of the lease for us to determine that such is necessarily the character of the estate granted by the lease. To warrant such assumption it must, of necessity, be true that an instrument granting an interest in oil and gas and denominated a "lease" conveys a determinable fee estate in the oil and gas. We cannot give indorsement to such a view. The owner of a fee-simple estate in land can transfer to another an interest in the oil and gas therein which may be a mere license, option, estate for life, or for years, as certainly as it may be a fee-simple or determinable fee estate. To hold otherwise would involve a denial of the right of a landowner to make usual and universally recognized contracts and agreements respecting his land. The allegations of appellants' petition do not show, with certainty we think,

that the estate conveyed by the lease is a determinable fee, but, even if so, with so many of the provisions of the modified lease unknown, it does not appear, as a matter of law, that the drilling obligation, because of the lack of the limitation of the time of performance, must perforce be construed as an agreement terminable at will.

■■ We have been unable to convince ourselves that the trial court was justified in concluding that the breach of the drilling obligation terminated the lease. Enough was alleged concerning the lease to show that it did convey some interest in the land. The subsequent agreement seems to have provided some kind of a condition of defeasance. Whether same be a condition subsequent or a limitation is immaterial, so far as the inquiry involves any question as to whether or not the forfeiture is a penalty or provision for liquidated damages. The law that governs is that involving the forfeiture or termination of estates in land. In a case such as made by the petition in question, the presumption seems to be that the provision for a defeasance is a condition subsequent, rather than a limitation. On this point we quote from Tiffany the following interesting and applicable discussion:

"It was at one time the law in England that in the case of a lease for years, a provision that the lease should become 'void' upon a default by the tenant in the performance of any particular stipulation had the effect of terminating the tenancy immediately, without any action on the part of the landlord, the courts thus, in effect, regarding such a provision, not as a condition but as a special limitation and excluding any right of election on the part of the lessor. This view has now, however, been to a great extent repudiated, it being recognized that the effect thereof was to enable the tenant desiring to terminate the tenancy for the purpose of ridding himself of any obligations under the lease, to do so by merely making a default, and thus taking advantage of his own wrong. The rule at the present time in England and also in most of the states is that, even though the instrument of lease provides that the lease shall become void or terminate upon the breach of a stipulation by the lessee, such a breach does not put an end to the tenancy until the landlord has in some way signified his election that it shall do so. * * * The effect of these decisions appears to be that, whatever the language used, whether that adapted to the creation of a special limitation or a condition subsequent, it will, if the contingency referred to is a default by the tenant, and the continuance of the tenancy involves an obligation upon him by way of payment of rent or otherwise, be construed as creating an estate on condition subsequent and not one of special limitation." 1 Tiffany, Real Property, 300.

But, for the reason already mentioned, in the absence of knowledge of all of the provisions of the modified lease, we are not warranted in undertaking to determine the precise character of the forfeiture. It is sufficient, for purposes of the present inquiry, that it does not clearly appear to be a limitation rather than a condition subsequent. If the forfeiture provision be a condition subsequent, then we are unable to attach any importance to the precise wording of same. The rule is as ancient as the common law that a forfeiture provision, which is a condition subsequent, that may work a defeasance of an estate in land, does not effect such defeasance in the absence of a re-entry, or equivalents which in the course of time have come to be recognized. Appellee cites but one case which it seems to us in any way appears to support its contention that the principles of law are applicable which have to do with the distinction between penalties and liquidated damages. Mercer-Lincoln Pine Knob Oil Co. v. Pruitt, 191 Ky. 207, 229 S. W. 374.

The opinion in this case we find difficult to understand. The chief difficulty arises from the fact that the provision for a reversion of the leases upon the failure to comply with the contract is recognized as a condition subsequent, and the characteristic incident of same is also recognized, namely that: "Breach of a condition subsequent does not per se produce a reversion of the title." We heartily indorse the further statement that: "The estate continues in the grantee or contractee until the proper steps have been taken to effect a forfeiture and ordinarily this requires a re-entry or some act that may be considered as a lawful substitute therefor. And to effect a forfeiture there must be some affirmative, positive act which manifests the intention of the contractor to this end." The case is then apparently made to turn upon the principle of the duty of one claiming the breach of a contract to minimize the resulting damages, and in the holding appears the remarkable statement, in view of what had preceded, that: "Since the parties have expressly stipulated in their contract what the measure of damages should be for a breach thereof, viz. a reversion of the leases to the first party, and finding nothing unconscionable in this provision, the parties will be relegated to the remedy they have agreed upon." It seems to have been held that there was no acceptance of the reversion of the leases by the appellee, since it is expressly stated that had such been the case appellees would have been in an entirely different attitude. To get any kind of consistent meaning out of the case, we find it necessary to interpret it as holding that appellees could not have the leases back and also have damages for breach of the development obligations, and that, since appellees had knowledge of the breach of the obligation before the expiration of the leases, it was their duty to demand the re-

turn of the leases and to pay the rentals necessary to keep them in effect as against the original lessors, in order to minimize the damages. Whether this understanding of the case be correct or not, we are unable to follow it to the extent of denying a right of waiver by a lessor for the breach of a condition subsequent. One phase of this interpretation of the case will be further noticed in discussing the recent case of Gwynn v. Mrs. Bell Wisdom, 14 S.W.(2d) 265 (Tex. Com. App.) not yet [officially] reported.

As appears from the statement, appellants sought recovery of damages measured by the reasonable cost of drilling the wells which it was complained appellee was under contract to drill. By the special exceptions sustained, other than those already discussed, this as the correct measure of damages was challenged. By the court's ruling on the exceptions it was, in effect, held: (a) That the reasonable cost of drilling wells was not the proper measure of damages, and that for the pleading to be sufficient to apply the correct measure, it was necessary to allege (b) the extent and nature of development required by the contract, and (c) the amount and value of oil and gas which would have been produced by the drilling of additional wells, and that same would have been produced in paying quantities. An attempt to pass upon this question is, to some extent, fraught with the same danger mentioned in the discussion of the others, that the validity of any conclusion reached may be materially affected or destroyed by unknown provisions of the lease. We feel reasonably satisfied, however, that we are justified in the view that it cannot, in the present state of the record, be determined as a matter of law that the measure of damages claimed is incorrect. In fact, we have no hesitancy in declaring that, in our opinion, for breach of an express covenant to drill wells under known conditions where the cost or expense of drilling must necessarily be within the contemplation of the parties, the measure of damages would be the reasonable cost of such drilling, in the absence of allegations of the parties claiming damages showing that some other measure of damages would afford just compensation. We believe the following authorities support this view: Henry Oil Co. v. Head (Tex. Civ. App.) 163 S. W. 311; Mitchell, Jones & May v. Dabney (Tex. Civ. App.) 294 S. W. 243; Covington Oil Co. v. Jones (Tex. Civ. App.) 244 S. W. 287; Law v. Swift (Tex. Civ. App.) 271 S. W. 106; T. P. C. & O. Co. v. Stuard (Tex. Civ. App.) 7 S.W.(2d) 878; All-American Oil & Gas Co. v. Connellee (C. C. A.) 3 F.(2d) 107; Ardizonne v. Archer, 72 Okl. 70, 178 P. 263; North Healdton Oil & Gas Co. v. Skelley, 59 Okl. 128, 158 P. 1180; Corbin O. & G. Co. v. Mull, 123 Ky. 763, 97 S. W. 387; Grass v. Development Co., 75 W. Va. 719, 84 S. E. 754, L. R. A. 1915E, 1057.

By supplement to its brief appellee cites us to the opinion of the Commission of Appeals in P. F. Gwynn v. Mrs. Bell Wisdom, 14 S.W.(2d) 265, decided March 13, 1929, not yet [officially] reported. The opinion furnishes support for appellee's contention. We cannot bring ourselves to assent to its correctness. The opinion was not adopted by the Supreme Court, and in our view the rendition of judgment as recommended does not necessarily show that the Supreme Court approved what was said on the point under consideration. At any rate, that case and this are distinguishable. In the Wisdom Case, unlike the one here, the termination of the lease under the condition or limitation providing for a defeasance thereof was claimed by the lessor. The lease was the consideration for the drilling obligation. From this it is clear that the lessor, having elected to take back the consideration for which the promise to drill was given, was seeking to hold the lessee for the full cost of drilling. Had the lessee performed and as a result thereof have discovered oil or gas, the lessee would have owned seven-eighths and the lessor one-eighth, of the production, but if, after electing to take back the consideration by enforcing forfeiture of the lease, lessor be given the full amount necessary to drill the well, then the lessor would have all of the production from the well and lessee be penalized to the extent of the cost of drilling same. In other words, the lessor will have full compensation and in addition thereto be the sole owner of an oil or gas well besides. What the consideration was moving to appellee for its drilling obligations expressed in the agreement of October 19, 1925, does not appear, nor is it necessary that we know. A valuable consideration is recited and is to be taken as a fact. It is stated in the briefs that there was a change in the royalty provisions of the lease, and, although this does not expressly appear, it is an almost necessary inference. If so, three wells having been drilled, which was a prerequisite to the change in the royalties favorable to appellee, the latter must have received the consideration for its drilling obligations. No question is presented involving any right in appellant to take back the consideration and at the same time enforce the obligation for which it was given. Our statement above of the rule we are following, by its own terms, does not include such a case. To our minds it is little short of preposterous to say that a landowner cannot, as a part of the conveyance of an interest therein, have as a part thereof an enforceable covenant of the grantee to drill one or a number of wells on the land conveyed. If such a right be qualified to the extent that, upon breach, in order to recover the equivalent in value of the performance of the covenant, he must show that he would ultimately profit to the extent of at least that amount, it simply amounts to a denial of

such right. As has been well said, to so hold would be a denial of that ancient right of a landowner to erect a monument thereon to his own caprice or folly. We have such high regard for even that right that we are unwilling to indorse a proposition which we believe has the effect to deny it.

The action of the trial court in overruling the special exception complained of in the cross-assignment is sustained, but the action of the court in sustaining the special exceptions complained of by the appellants is overruled.

The judgment dismissing the cause is reversed and the cause remanded.

## On Rehearing.

Appellee's motion for rehearing has challenged our careful consideration of all questions discussed and particularly the question as to the measure of damages. Undeniably the latter is the most difficult, as well as the most important, question involved. Our conclusions will require some restatement, if not modification, of our views, as expressed in the original opinion, but will not lead to any different disposition of the case.

There can be no valid contention that appellants' pleading does not state a cause of action. It certainly does sufficiently charge the breach of a contract. "If a contract has been broken, and the plaintiff cannot prove that any damage has been caused, he is, nevertheless, entitled to nominal damages." Williston on Contracts, § 1340. Appellee, however, particularly and by special exception challenged the sufficiency of the pleading to support a claim of damages measured by the cost of drilling the wells. The original opinion sustained the pleading against that criticism.

Damages for breach of contract are something different from damages for tort. The latter are given by way of restoration to the injured party of what he has lost or will lose as the result of another's wrong; the former are to compensate one party to the contract for the breach by the other by allowing the value to him of such performance. If, in case of breach of contract, the law would do no more than to allow only such damages as would save the plaintiff from loss from having made the contract, that would amount to a refusal of the law to enforce performance of a contract by means of assessing damages. It would result that any party to a contract, even though the other party had fully performed his obligations, could, without the consent of the other, enforce a rescission simply by refusing to perform and by tendering back what had been received and otherwise saving him from loss, not including (but excluding) any loss of advantage from the contract.

Having construed (at least tentatively, or provisionally) the contract obligation under consideration to be a covenant, what was said by the Supreme Court, speaking through Judge Greenwood in T. P. C. & O. Co. v. Barker, 6 S.W.(2d) 1031, relative to how the policy of the law is to be accomplished, is applicable here. It was there said: "The purpose of the law to give compensation for breach of contract is subserved by allowing the injured party to have the value to him of the contract's performance." If the covenant were one to reasonably develop the leased premises or to protect same from drainage, the last-named decision is unquestionably authority for the proposition that the measure of plaintiffs' damages is the value of rents or royalties that would have been received had the covenants been performed, but were not received because of their breach. Is performance in such a case the same as performance in this case? Performance of the lessee's obligations dealt with in the Barker Case would consist of reasonable development or reasonable protection of the leased premises. Performance in this case consists of drilling three wells each year. The latter is certain, the former uncertain, being dependent upon factors that in their nature could only become known during progress of the work, and that would, therefore, determine the ultimate nature and extent of the performance. In this case, when a particular year had expired and three wells had not been drilled, there would certainly be a breach of the contract. It being certain what constitutes performance, it is equally certain when there is a failure to perform. Not so when performance consists of reasonable development or protection. Just as in the very nature of the case it cannot be known at the time the obligation is incurred of what performance will consist it likewise cannot be known with certainty at any particular stage of the work that performance has or has not been completed. Stated in other words, there is an element of uncertainty in what constitutes performance of a covenant to reasonably develop or protect a lease that is absent in a covenant to drill a well or a specified number of wells to a contemplated depth. How, if at all, does such difference affect the problem of assessing damages? A leases land to B, and as a part of the consideration B covenants that in case of the discovery of minerals, he will reasonably develop the leased premises.

The courts have read into the lease itself just such obligation, even though unexpressed. Upon breach of such covenant why would not the reasonable cost of doing the required development work, drilling wells, etc., fairly measure the damages to the lessor? Perhaps an all-sufficient answer may be: That at the time of making the contract it was humanly impossible to even estimate such cost. But, suppose A's land is without any known mineral value and he contracts

with B to drill a well on it to a specified depth for a certain cash consideration paid. Upon breach of the contract by B to drill, could he justly complain if A claimed of him, as a measure of his damages, the reasonable cost of drilling the well? Appellee, we think, would not contend otherwise. Why would the reasonable cost of performance be, at least, not unfair to the defendant as representing the proper amount of compensation due for the breach of his contract? Is it not because of the certainty that such cost is practically the equivalent in value of the thing to be done? It cannot be seriously contended in such case that no damages would be recoverable except upon pleading and proof that the well would have produced minerals, and the amount and value thereof.

The very purpose of the contract was to ascertain if minerals, in fact, existed. As the result of the breach, A is deprived of any knowledge that they do or do not exist. To require A to show the existence and value of such minerals would obviously result in denying him any relief whatever, or else would subject B to an equally great injustice; viz., the hazard of a jury's wild guess. Even if the cost of performance represented a much less exact compensation, it would, nevertheless, be necessary to measure the damages by it, because of the absence of any other adequate standard. It may be said in this connection—however, we do not think it correct to say—that the allowance of damages measured by the cost of drilling has for its purpose the enabling of A to drill the well himself. The law is concerned no further than to award to A the monetary equivalent of B's performance. No doubt a little confusion of thought on this point gives rise to the suggestion that A, by drilling the well, could recover the cost, but otherwise could not. Should A drill the well himself and include the cost in his claim for damages, then that, if allowable, would be on an entirely different theory. The governing principle in such case would be that applicable to expenses incurred in mitigation of damages. A's duty to drill the well, and the drilling of which might constitute a condition upon which his right to recover the amount of the cost might be made to depend, would involve inquiry into a number of things. For instance, if A were wholly unable to drill, he would certainly be under no duty to do so in order to mitigate B's damages. On the other hand, if he were amply able and by fortuitous circumstances could certainly do so at a less cost than B could have drilled, he might be under the duty to do so. But this is merely by the way and not vital to the question under consideration. That A, in the supposed case, may recover back the consideration he has paid B and for expenses incurred in reliance upon the contract, is wholly beside the question. That would be but waiving B's performance.

Now, let us consider what would be the difference, if any, in the case just supposed, if A, instead of a cash consideration, gave B the lease in consideration for the covenant to drill the well, and to pay certain royalties in the event minerals were discovered. We will say the lease was without value in the absence of any drilling obligations. If performance of the covenant results in the discovery of minerals, it is true that B will profit far more than A. Also, if the minerals exist, B will lose more by the breach of the obligation than will A. But the performance called for by the contract is not discovering or producing minerals; it is the drilling of a well to a specified depth. The advantages that may be expected to flow from the discovery of minerals may constitute the motive inducing the parties to enter into the contract; but certainly no part of either the consideration or obligations of the contract. The cost of such drilling is capable of reasonably accurate estimation at the time the contract is made. Parenthetically, it may be observed that had the covenant been to discover or produce minerals, such estimation of the cost could not have been made. The only difference in the case first supposed and this one is that in the first the consideration paid by A was actual and of known value, while in the second the consideration (the value of the lease) was speculative and potential only; and in the first case, in the event that performance resulted in production, all of it would belong to A, while in the second, only a proportionate part would be his. Do such differences call for the application of different rules? We are unable to see that they do. If B breaches the covenant, it is true that A may not have lost anything, but it is equally true that he is deprived of everything that he contracted for. Whether that something be valuable or valueless he does not know. By his contract he acquired the right to have B do the work necessary to ascertain that fact. The cost of the work was capable of reasonable estimation. Are we then confronted with the alternative of saying that such a covenant is incapable of enforcement and only nominal damages can be recovered, or else that parties in the position of B are to be made to respond in damages, the amount of which must simply be guessed at by a jury? May not either alternative be avoided and an answer found that will conform to the following principles stated by Professor Williston, viz.:

" * * * If the plaintiff has given valuable consideration for the promise of a performance which would have given him a *chance* (italics ours) to make a profit, the defendant should not be allowed to deprive him of that performance without compensation unless the difficulty of determining its value is extreme. * * * Though the fact that the plaintiff's damage is uncertain in

amount, or even that it is uncertain that substantial damage has been caused, should not deprive plaintiff of a right to compensation for the loss of the defendant's performance which would have given the plaintiff a *chance to make profit* (italics ours) or avoid damage. *Such uncertainty is a reason for applying some other test, if another test is possible for estimating his damages than by letting a jury guess at the value of the plaintiff's chance or probability by seeking to estimate his probable profits and loss.* (Italics ours.) \* \* \* Where a breach of contract involves deprivation of a *chance* (italics ours) which is valuable in a business sense, a just reluctance will be felt by most courts to deny altogether the recovery of substantial damage." 3 Williston on Contracts, § 1346.

█ We have concluded that these principles can be justly applied in cases like the two above supposed, by employment of a legal presumption. That presumption is that the parties, in making the contract, have each sought to give the other value for the other's undertaking or consideration. Since that value to the plaintiff, in cases like those under consideration, is, in the very nature of things, incapable of estimation, it will be presumed to be at least as much as the reasonable and readily estimated cost of performance by the defendant, and may be claimed by pleading and proof of such cost. If the damages be less than the amount so presumed, and the defendant becomes possessed of means to make proof of that fact, within the limits which exclude mere conjecture and speculation, then it should be his privilege to do so. We admit we have not been able to find any authority laying down specifically such a rule. Support for it, we think, in principle, is given in 2 Sutherland on Damages (2d Ed.) p. 590, wherein it is said: "We know it to be an established maxim that in assessing damages every reasonable presumption may be made as to the benefit which the other parties might have obtained by the bona fide performance of the agreement."

A good analogy is found in Southern Surety Co. v. Petrolia Land Co., 252 S. W. 204, by the San Antonio Court of Civil Appeals, speaking through Judge Smith. The suit was upon a bond for $1,000 given to secure compliance with an obligation to drill a well. Defendant claimed that the bond provided a penalty, and not liquidated damages, and that there being no evidence of damages, only nominal damages could be recovered. The court declined to pass on the question of whether the bond provided a penalty or liquidated damages, holding that it was unnecessary to do so, since, if liquidated damages, the judgment was proper, and if a penalty, then the burden of proof was upon the defendant to show that the damages were of such nature as to be clearly ascertainable and were, in fact, substantially less than the

amount designated in the bond. In other words, the express obligation of the bond supplied the presumption, in the absence of countervaling evidence to the contrary, that the amount of damages, at least, equalled the amount nominated in the bond. No authority was cited for the holding, possibly because it was considered the principle was too well settled to require it. At any rate, it seems to us to be a rule that would tend to accomplish the ends of justice. If so, then the rule we have suggested would do likewise—differing as it does only in the slightly greater burden of establishing the amount of damages presumed. Such a rule will in no wise contravene the principle that the damages recoverable are such as represent the value to plaintiff, rather than the cost to defendant, of performance; since, after all, the damages allowed are the value to plaintiff of defendant's performance, established by a presumption that the amount thereof is at least as much as the cost of performance by defendant.

█ It is, perhaps, unnecessary to say that the rule suggested, being in the nature of an exception to a more general rule, or rather a special means of enforcing the general rule, would have no application to any case in which the value to plaintiff of defendant's performance may be reasonably and fairly estimated. If B covenant with A to erect a costly building on A's land, designed for a particular purpose, with the agreement that the rents for a period of years shall belong, seven-eighths to B and one-eighth to A, upon breach of the agreement to construct the building, there would arise no occasion to resort to the presumption mentioned, because the rental value of such a building is capable of just approximation.

█ It remains to consider whether the rule, if proper in cases like those supposed, may be applied to the facts of the instant case. The case at bar differs from the supposed cases in at least three particulars: (1) the covenant was added to the lease long after the lease was executed and after the discovery of oil and gas; (2) an independent consideration was given for the covenant; (3) the previous discovery of minerals, no doubt, rendered it less uncertain that minerals would be produced by drilling the additional wells, as well as the amount and value thereof. Whether or not appellants may be entitled to avail themselves of the presumption, which we have concluded can be done under some circumstances, may not appear from the allegations of the pleading with perhaps sufficient certainty. But, if so, appellee's special exceptions do not complain of such defect. By one such exception it is contended that the extent and nature of the development required are not alleged, and by another that the pleading fails to show the amount or value of the oil or gas which would have been produced, or that the wells would have produced in paying quan-

tities, or in any amount whatever, etc. By these exceptions it is plain appellee does not challenge appellants' right to recover damages based upon the cost of drilling the wells, but evidently contenting itself that no such recovery could be made, complains of the sufficiency of the pleading to show facts to support a recovery on any other theory. It follows that, unless we can say for certain that appellants are not entitled to employ the presumption, we must hold that the court erred in sustaining the special exceptions. But we think we may take judicial knowledge that, even in at least some proven oil and gas fields, one or more producing wells afford little or no evidence that another well would produce a given amount, or even produce at all. At any rate we cannot say, as a matter of law, that appellants were not, under their allegations, entitled to rely on the presumption and fix their measure of damages accordingly.

What has been said is not in conflict with the decision in T. P. C. & O. Co. v. Barker, supra. The difference in the cases has already been mentioned. But, notwithstanding such difference, we do not think that the rule for the measure of damages announced in said case necessarily excludes, as an alternative, the employment of the presumption mentioned above, in cases similar to the Barker Case. The test, of course, would be whether or not the reasonable cost of performance (i. e., to reasonably develop or protect from drainage the leased premises) was, at the time of making the contract, within the contemplation of the parties and capable of being proved with reasonable certainty by competent evidence. If the last-named conditions did not exist, there would be no way to establish the presumption, and, of course, it could not be made to operate. But, if such conditions do exist in a given case, we see no reason why the presumption may not be established in that kind of case as well as others. The Barker Case holds that the damages, in a case like that, are not to be restricted to merely nominal damages.

The motion for rehearing is therefore overruled.