## GUARDIAN TRUST CO. et al. v. BROTHERS (BAKER et al., Interveners).
### No. 1088.

Court of Civil Appeals of Texas. Eastland.
April 7, 1933.

Rehearing Denied April 28, 1933.

Baker, Botts, Andrews & Wharton, of Houston, and Grisham, Patterson & Grisham, of Eastland, for appellants.

Conner & McRae, of Eastland, for appellee.

HICKMAN, Chief Justice.

On June 29, 1926, appellants Guardian Trust Company and Mrs. Ella M. Corbett, joined by her husband, W. C. Corbett, executed an oil and gas lease covering 120 acres of land in Eastland county to L. F. Brothers, of which the following is all that is material to a decision of this case:

"That Guardian Trust Company, a Texas corporation domiciled in Houston, Texas, and Mrs. Ella M. Corbett, joined pro forma by her husband W. C. Corbett, both of Brazoria County, Texas (said above named parties being hereinafter referred to as 'Lessors'), in consideration of the covenants and agreements hereinafter specified, do hereby lease unto L. F. Brothers of the post office of Desdemona, Texas, (hereinafter called 'Lessee') the following described land. * * *

"The purpose of this lease is such that so long as it remains in force the Lessee shall have the exclusive right to prospect and drill on said land for oil, gas, and other minerals and remove the same therefrom; to erect and maintain thereon and remove therefrom all necessary or proper structures and equipment, including the right to pull casing from abandoned wells; and to install and maintain thereon and remove therefrom all tanks and other means of storage, and all pipes and other means of transportation; with full right of ingress and egress at all times for any of said purposes. And subject to the royalties hereinafter reserved, all of the oil and gas in and under said land is hereby granted and conveyed to Lessee. * * *

"Lessee binds and obligates himself to commence a well for oil and gas on said land within sixty (60) days from the date of this lease, and to prosecute operations thereafter on said well with due diligence, in a faithful effort to discover and produce oil or gas in paying quantities, said well to be drilled to the general depth of the Desdemona sand, estimated to be about 2800 feet in the part of the field where said leased land is located, unless oil or gas in paying quantities be found and produced at a lesser depth.

"Should said first well be completed as a dry hole, the Lessee shall, nevertheless, have the right to continue efforts to discover and produce oil in paying quantities and may drill as many other wells as he pleases, (provided that until the discovery and production of oil in paying quantities not more than sixty (60) days elapses between the completion or abandonment of one well and the commencement of operations on another), and provided all such operations are conducted with reasonable diligence when begun; but if, prior to the production of oil or gas in paying quantities, more than sixty days should elapse after the completion or abandonment of one well before the commencement of another well, or if operations once begun on any well should not be conducted with reasonable diligence, this lease shall thereupon terminate, and the mineral estate hereby granted shall revert to Lessors.

"If oil or gas should be found and produced in paying quantities from said first or any subsequent well drilled on said land in accordance with the provisions hereof, then this lease shall remain in force and effect so long as oil, gas, or other minerals are produced from said land in paying quantities, or so long as Lessee is engaged in good faith and with reasonable diligence in drilling operations on said land, or in endeavoring to bring back wells to production.

"Having discovered oil or gas in paying quantities, the Lessee shall thereafter be obligated to proceed with due diligence to the reasonable development of said leased premises; and if at any time during the life of this lease there should be brought in on adjoining land a well producing fifty barrels of oil or more for thirty consecutive days, or a well producing gas in paying quantities, Lessee shall thereupon with reasonable diligence begin and prosecute the drilling of an offset well on the leased land in a faithful effort to reach the strata from which the well on said adjoining tract is producing, and to obtain a producing well on the land hereby leased, offsetting said well on adjoining tract."

Brothers did not perform any of the covenants therein contained, but wholly breached the same. Appellants instituted this suit against him for damages for breach of the covenant to drill a well on the land covered by the lease. A plea of intervention was filed by James A. Baker, Edwin B. Parker, H. M.

Garwood, Jesse Andress, C. R. Wharton, C. L. Carter, W. H. Walne, and J. H. Tallichet, the then members of the law firm of Baker, Botts, Parker & Garwood, of Houston, alleging that they were the real and true beneficial owners of an undivided two-thirds interest in the tract of land covered by the lease; that Mrs. Ella M. Corbett and her husband, W. C. Corbett, were the owners of the other undivided one-third interest; and that the legal title to the interest of the interveners stood in the name of Guardian Trust Company for convenience. In their plea they ratified and confirmed the lease contract, adopted the suit as their own action, and prayed that it proceed in the name of Guardian Trust Company the same as if it had been originally instituted in the name of the interveners.

It is not necessary to give a detailed statement of appellants' pleadings for they have clearly and fairly interpreted them in their brief in this terse language: "The real question for decision, so far as plaintiffs' right to recover under their pleadings is concerned, is as follows: Was the reasonable cost of drilling the well the correct measure of damages for breach of the contract? If it was not, the plaintiffs, under their pleadings, were not entitled to recover. If it was, then judgment should have been in their favor for the sum of $8,000.00, the agreed cost of drilling the well contemplated by the contract."

The case went to trial before the court without a jury and in its development appellants offered the following evidence: (1) The lease; (2) a written agreement signed by attorneys that the actual cash value or cost of drilling the well in question as contemplated by the contract sued upon, at the time that same was to be drilled on the land in question, would have been $8,000; and (3) an agreement in open court that Brothers never commenced the drilling of a well within sixty days after the date of the contract and has never drilled a well on the land in question, and that the lease involved in the suit was prepared by the firm of Baker, Botts, Parker & Garwood, interveners. No other evidence was offered by appellants.

Appellee offered evidence designed to show that the lease had no market value at the date the contract was made, and that drilling would not have resulted in the discovery of oil or gas in paying quantities. We do not find it necessary to evaluate appellee's evidence, as it is not to control in the disposition of the case.

After appellee rested, appellants introduced in rebuttal certain correspondence passing between the parties, and the case was submitted to the court. Upon this evidence judgment was rendered that the plaintiffs take nothing, and this appeal followed.

■ As stated by appellants in their brief, if the cost of drilling an oil well at the time appellee breached his contract is not the correct measure of their damages, then the judgment was properly rendered against them, for they neither pleaded nor proved any other damages. In determining this question it is necessary to keep in mind the universally recognized rule that, for breach of contract the injured party is entitled to have the value to him of its performance, and, in awarding compensatory damages, he should be put as near as possible in the same position as that in which he would have been put by performance. The rule is stated in 17 C. J. § 168, pages 848, 849, in this language: "But a plaintiff is not to be put in a better position by a recovery of damages for the breach of a contract than he would have been in if there had been performance."

Our Supreme Court, speaking through Justice Greenwood, in Texas Pacific Coal & Oil Company v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, 1037, 60 A. L. R. 936, states the same thought in this language: "The purpose of the law to give compensation for breach of contract is subserved by allowing the injured party to have the value to him of the contract's performance."

■■ If this well-established and fundamentally sound rule is to be applied to a contract for the drilling of an oil well, then the question arises, would $8,000 have been the value to appellants of performance, or, stated differently, would the payment to appellants of $8,000 put them in the same position that they would have been put had the well been drilled? The answer to that question is not difficult. The true and ultimate purpose of all parties to the lease was "the mutually profitable production of oil, gas, or other valuable mineral." Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 308, 255 S. W. 601. No other value to appellants than the value of the royalty was contemplated. The land was situated in an oil field and three wells had been drilled on this very tract a few years before this lease was executed. The royalty was one-eighth of the oil and a like proportion of the proceeds of the sale of gas. Its value might have been substantially more than $8,000 and it might have been substantially less. The only way to put appellants in the position they would have been put by performance would be to award them damages measured by the value of their royalty. The burden was upon them to establish that value, but they offered no evidence thereof. There is no more reason to fix that value at $8,000 than there is to fix it at $10,000 or $2,000. To do so would be to hold that the measure of damages for the breach of a contract is not the value of performance to the obligee, but is the cost of performance to the obligor.

■ Suppose these appellants had been the owners of a vacant lot in the town of Desdemona, near which the land covered by this

lease is situated, and had entered into a contract with appellee, under the terms of which appellee agreed to erect a building thereon according to certain specifications and to pay appellants one-eighth of the gross revenues to be derived from renting the building, and that the contract had provided that appellee should have the right to remove the building at the expiration of the lease, placing the land in as good condition as it was before the lease was given. Then suppose that appellee had failed to erect the building. Would it be seriously contended that appellant's measure of damages for the breach of that contract would be what it would have cost to erect the building? We think not. The loss or injury actually sustained by the obligee, rather than the cost of performance by the obligor, is the proper measure of damages for the breach of a contract. When that well-established rule is departed from, compensatory damages become either punitive damages, because too much, or inadequate damages, because too little, and the fundamental purpose of compensatory damages is lost sight of.

We can see no just reason for departing from the well-established rule of law for measuring damages simply because the contract relates to the sinking of an oil well. The fact that the nature of the contract is such as to render it impossible to ascertain with mathematical accuracy the exact amount of the damages suffered by the lessor should not operate to change the rule. The parties knew that difficulty inhered in the subject about which they were contracting, but chose not to stipulate for liquidated damages. This question is fully discussed in Texas Pacific Coal & Oil Co. v. Barker, supra. See, also, 13 Tex. Jur., pages 78, 79.

In Restatement of the Law of Contracts by the American Law Institute, vol. 1, p. 576, § 346, the following illustration is given of the application of the general rule for measuring damages: "A contracts with B to sink an oil well on A's own land adjacent to the land of B, for development and exploration purposes. Other exploration wells prove that there is no oil in that region; and A breaks his promise to sink the well. B can get judgment for only nominal damages, not the cost of sinking the well."

We are unable to distinguish the instant case from the case of Texas Pacific Coal & Oil Co. v. Barker, supra. In the latter case the lessee covenanted: (a) To begin the actual drilling of a well within thirty days; (b) to prosecute the drilling with reasonable diligence; (c) to give due protection against offset wells; (d) to dedicate at least one string of tools to the development of the tract; and (e) to keep said string of tools operating until the tract was developed or until it had been determined the tract was unworthy of further tests. In the instant case the appellee covenanted: (a) To commence the drilling of a well within sixty days; (b) to prosecute operations with due diligence; (c) having discovered oil and gas in paying quantities, to proceed with due diligence to the reasonable development of the premises; and (d) to protect the property from drainage by drilling offset wells.

The tract of land covered by the lease in the instant case was within the Desdemona oil field. Several years prior to the making of this contract three wells had actually been drilled upon this tract, two of them resulting in dry holes and one in a small producer. There were wells drilled on adjacent tracts, some of them being dry and others producers. With the aid of the information obtained from drilling in this field and the history of the wells, experts could doubtless have given very valuable testimony as to the probable production from this tract. There is no reason to believe that expert testimony would have been any more reliable and accurate in estimating the lessors' damages in the Barker Case than in the instant case. In the opinion in the former case, after quoting from many decisions holding that the best evidence of which the subject will admit is reasonable, and that expert witnesses acquainted with the field could testify with reasonable accuracy as to the loss in oil and gas production suffered by the lessor by the lessee's failure to perform his contract, the rule for measuring the damages is announced in this plain language: "The amount and value of oil or gas production, obtained or obtainable through reasonable diligence, must be definitely alleged, and must be proven with reasonable certainty before damages may be allowed for breach of an express or implied covenant to continue the production of oil or gas, whether such damages result from failure to produce oil or gas or from loss of same by drainage."

We are aware that there are cases which hold that the measure of damages contended for by appellants is the correct rule. Some of these cases involved contracts where the obligee would own the entire completed well and others involved facts similar to those in the instant case. This court announced that as the proper rule in the cases of Mitchell, Jones & May v. Dabney (Tex. Civ. App.) 294 S. W. 243, 245, and Texas Pacific Coal & Oil Co. v. Stuard (Tex. Civ. App.) 7 S.W.(2d) 878, 881. It made the same announcement in the original opinion in Curry v. Texas Company (Tex. Civ. App.) 18 S.W.(2d) 256, but modified it to some extent in the opinion on rehearing. Writ of error was granted in that case but the litigants agreed on a compromise and had the appeal dismissed. Since the writer of this opinion also wrote the opinion of this court in the Stuard Case, he feels that he can take some liberties therewith. That opinion did not apply or follow the rule there announced, but, on the contrary, applied and

followed the rule stated therein in this language: "The sole purpose of actual damages is compensation. Appellees are not entitled to damages by virtue of appellant's breach of the contract greater in amount than the money they would have received had it not been breached."

But, without discussing the different cases in which this question was involved, we think we can assert with confidence that the Supreme Court of this state has never indicated its adoption of the rule relied upon by appellants.

The attorneys disagree as to the principle of the holding in the case of Gwynn v. Wisdom, 119 Tex. 320, 30 S.W.(2d) 298. Without undertaking to analyze the principle underlying the final decision in that case, we think it can be said that it lends no sanction to the rule that the cost of performance by the obligor is the measure of the damages suffered by the obligee.

It is our conclusion that appellants neither pleaded nor proved any damages suffered by them on account of appellee's breach of his covenant, and since no complaint is made of the failure of the trial court to award them nominal damages, the judgment of that court is affirmed.

FUNDERBURK, Justice (dissenting).

This court, in three cases, has approved the measure of damages contended for by appellants. Mitchell, Jones & May v. Dabney (Tex. Civ. App.) 294 S. W. 243, 245; Texas Pacific Coal & Oil Co. v. Stuard (Tex. Civ. App.) 7 S.W.(2d) 878; Curry v. Texas Company (Tex. Civ. App.) 18 S.W.(2d) 256. In the latter case there was on rehearing some modification of the previously expressed views. We have, however, in the instant case, approached the consideration of the question as one still open, if not subsequently concluded by the opinion of the Supreme Court in Gwynn v. Wisdom, 119 Tex. 320, 30 S.W.(2d) 298, 300. The conclusion of the court in the last-named case was stated thus: "The damages suffered by Mrs. Wisdom, under the facts of this case, were such special damages, if any, as she may have suffered by reason of, or on account of, Gwynn's *delay* [italics ours] in beginning to drill as he had contracted." The obligation of Gwynn as provided in the lease to begin within thirty days the drilling of a well, while an unconditional covenant, was, at the same time, perforce of the contract a condition subsequent upon which the determinable fee estate conveyed by the lease was granted. Upon breach of the covenant (same being also a condition subsequent) the lease did not ipso facto terminate. Forfeiture could be waived, and unless asserted would be waived. Mrs. Wisdom promptly asserted the forfeiture. She, in legal parlance, made a re-entry upon the land (the oil and gas therein). The effect of the decision of

the Supreme Court, as we construe it, was simply to hold that she could not assert the forfeiture, and also, for breach of the covenant, claim damages measured in any way so as to give her compensation for failure to drill the well. The court, in stating that under the facts of the case the damages recoverable were such special damages, if any, as she may have suffered on account of the *delay*, evidently meant that such would be the case had she not elected to claim a forfeiture of the lease. Gwynn was within his contract rights in delaying commencement of the well until just before the expiration of thirty days. In other words, there was no delay until the expiration of the thirty days' time. On the 31st day Mrs. Wisdom had the fully accrued right to declare a forfeiture of the lease and the consequent further right to forbid Gwynn thereafter to commence or prosecute the drilling of the well. On that day her cause of action accrued for damages, if any she had, for breach of the covenant to drill the well. We do not believe that the opinion of the Supreme Court should be understood as holding that, under such circumstances, Mrs. Wisdom had any right to damages for delay. Manifestly there could have been no delay prior to the accrual of the only cause of action she could have had for damages. Therefore, it seems the court must have had reference to what would have been Mrs. Wisdom's right had she waived forfeiture of the lease, thereby allowing the lease to continue in effect and have elected to assert only her cause of action for damages for the breach of the covenant. In such case Gwynn, having the right to do so, could have drilled the well and thereby have limited his liability for damages to such only as may have been occasioned by the delay. We have therefore concluded that the question for decision is still open, so far as the decision of the Supreme Court in Gwynn v. Wisdom is concerned. That case, we think, would not be authority for the proposition that, even if the lessee repudiated his obligation and abandoned the lease, he could not be held, upon the plaintiff's election to do so, to respond in damages other than for mere delay.

"The measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed. In other words, the person injured is, so far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed." 17 C. J. p. 847, § 168. Unquestionably this is a correct statement of the law applicable to the case. In agreement therewith is the statement by our own Supreme Court of the ruling principle, as follows: "The purpose of the law to give compensation for breach of contract is subserved by

allowing the injured party to have the value to him of the contract's performance." Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, 1037, 60 A. L. R. 936. The specific question presented for decision may then in other words be stated as follows: Would the allowance to plaintiffs of the sum of $8,000, the agreed reasonable cost of drilling the well, be "the value to" plaintiffs "of the contract's performance?" By value of the contract's performance we understand is meant the monetary equivalent of the contract's performance. So understood it is easier to see that the value of the contract's performance may not include the profits from the possible production of valuable minerals. In an unproven field a contract for a test well which obligates one party absolutely to drill the well to a specified depth contemplates no more than a *chance* to profit by the possible discovery of minerals. It contemplates that, when the contract is fully performed, there may be no valuable minerals discovered, and hence no profit from the production thereof. It is therefore apparent that the value of the contract's performance in the very nature of such a case would not include something which the contract did not contemplate as being embraced within its performance. This, it seems to us, is a consideration of vital importance in our inquiry.

In order to show the proper application of the law as above stated, to the facts of the particular case, we believe this can best be done by supposing a case or two different from the instant case, but in which such application can more readily be seen, and then showing, if we can, that there is no material difference between the supposed cases and this case.

*First case:* A owns a lot and makes a contract with B, a building contractor, to construct a building thereon according to plans and specifications. For some special reason, we shall say, A pays the consideration in advance. B wholly breaches his obligation. A elects to sue for damages for breach of the contract rather than to rescind and recover the consideration paid. What is the correct measure of damages? What would be the value or monetary equivalent to A of the contract's performance? It seems to us there could be no valid argument that the reasonable cost of constructing the building to comply with the contract would be the proper measure of his damages. It will perhaps be conceded that, if A, being able to do so, should himself construct the building, he would be entitled to recover as his damages the reasonable cost of constructing same. Since the measure of his damages would be the reasonable cost of constructing the building and not the actual cost, no good reason can be perceived why, if he did not construct the building, he should not nevertheless be entitled to recover as damages the reasonable cost of constructing the building. Both propositions we regard as supported by both reason and authority. As said in 9 C. J., p. 812, § 149, upon the subject of building contracts: "In case of failure to perform, the measure of damages is the difference between the contract price and the fair cash market price or value of the doing of the work contracted for. * * * Where the contractor has been paid in advance the measure of damages is the value of the building when completed in accordance with the contract." Simons v. Witmann, 113 Mo. App. 357, 88 S. W. 791; In re Carrier (D. C.) 21 F.(2d) 589; Hamilton v. Stephens, 240 Mich. 228, 215 N. W. 321. The authorities cited show that by "value of the building" is not meant the value of the land, including the building. It means, as first stated in the quotation, "value of the doing of the work contracted for." The case of Simons v. Witmann, supra, will be found most interesting and instructive upon the problem presented in this case.

*Second case:* A pays B in cash a sum of money to drill a well to a specified depth on land owned wholly by A, it being contemplated as indicated by recitations in the contract that a test is thus to be made of the possible existence of valuable minerals. B breaches the contract. A, being able to do so, drills the well in just such way that, had it been drilled by B, would have constituted full performance. The reasonable cost of drilling the well was $8,000. If our observations upon the first supposed case be granted to be correct, then we think there can be no difference of opinion, but that A would be entitled to recover as damages for the breach of the contract the sum of $8,000; the reasonable cost of drilling the well. The $8,000 would be the exact monetary equivalent of the contract's performance. That would be equally true whether the well was dry or a producer of 10,000 barrels of oil per day. In such a case there could be no valid argument, we think, either that the reasonable cost of drilling the well was not the value to A of the contract's performance or that such value included any profit from the production of minerals. If the consideration for said contract was legal and sufficient to support it, then it would be wholly immaterial what was the nature, amount, or value of such consideration. It necessarily follows that, if instead of the payment of cash, A paid the consideration by conveying to B another tract of land, or by executing and delivering to him a lease on other land or by giving any other thing of value sufficient to constitute an executed consideration, it would make no difference. It is also just as certainly an immaterial matter in either case what it would have actually cost B to perform his obligation, or that the consideration received by him originally sufficient to support the contract turned out to be of little or no value. Just as in the case

first supposed, the reasonable cost of drilling the well and not the actual cost, being the measure of A's damages, it would not be necessary for him to drill the well in order to recover damages. Suppose B's obligation to drill the well was one enforceable in an action for specific performance. To specifically enforce the contract, what would the court order B to do? The court, of course, would order him to drill the well. In lieu of that, what more certain and just legal equivalent could be given than a sum of money representing the reasonable cost of drilling the well? Is it a sufficient objection to say that if the well is not drilled but a sum of money equal to the reasonable cost of such drilling is allowed in lieu thereof, the parties will not be thereby placed in the exact position they would have been had the contract been performed in that A would still not have had his chance to profit by the possible production of minerals? We think not. According to the rule as quoted from Corpus Juris above, it is only *"so far as it is possible"* (italics ours) that the person injured is "to be placed in the position he would have been in had the contract been performed." Upon what principle of right or justice could the defendant be heard to object that, since the award of damages measured by the cost of drilling the well would not place the plaintiff in a position *fully* as good as if the contract had been performed, such measure of his damages must be rejected? That measure of damages will place him in as good position "as it is possible to do so" and that is the measure of A.'s right under the law. It certainly does not lie in the mouth of the defendant to object that it may fall a little short of full compensation.

Thus far, we think, we have not entered upon really controversial ground. We now come to that in our endeavor to show that the same rules and principles applicable to the two cases supposed are likewise applicable to this. All three cases are alike in that an executed consideration was paid in advance for the obligation to drill the well. In the instant case such consideration was the execution and delivery of the oil and gas lease. The cases are alike in that the contract contemplated a test well in an unproven field. The evidence showed that in the "boom days" three wells had been drilled upon the land covered by the lease, of which two were dry and one a small producer. A few wells on other land in the vicinity were, some dry, and others small producers. The correspondence of the parties leading up to the making of the lease and the surrounding circumstances all seem clearly to show a mere chance to discover oil or gas in paying quantities was within the contemplation of the parties. The purpose of the contract was, by actually drilling a well, to determine the existence or not of profitable production. Aside from the defendant's uncon-

ditional obligation to drill the well, most of the respective rights and duties of the parties were in the very nature of the situation contingent and conditional.

Wherein does this case differ from the two above supposed? We think we may safely assume that any differences which can be thought to be material consist of one or both of the following facts, namely, (1) that the well was to be drilled upon the land covered by the lease given as a consideration for defendant's obligation to drill it, and (2) that, in the event the drilling of the well resulted in the discovery and production of minerals, defendant would be the owner of seven-eighths and plaintiff one-eighth thereof. The only difference, we think, as respects the subject of inquiry, between an obligation to drill a well upon land owned wholly by the plaintiffs, and an obligation to drill a well upon land owned wholly by defendant, would be material only in determining what was within the contemplation of the contracting parties. There could be no uncertainty in that respect, where the obligation was to drill a well for oil or gas on plaintiff's land, but an obligation of the defendant to the plaintiff to drill a well on defendant's own land in which the plaintiff had no interest might present a different question as to what was within the contemplation of the parties as an advantage or benefit to the plaintiff. But as between such two cases, the instant case is like the first and unlike the second. It just as certainly contemplates the chance of a profit to the plaintiffs from performance in one case as the other. The fact that defendant's performance gives him also a chance to profit from production does not alter or detract from the fact that a chance for a profit to plaintiff will be the result of defendant's performance within the contemplation of the parties. The latter fact is the material one in the present inquiry, and it certainly exists where the well is to be drilled on defendant's lease but in which plaintiff has a royalty interest just the same as where plaintiff is sole owner of the minerals. The amount or degree or proportion in which plaintiff and defendant may profit is wholly immaterial. The material question is, Does the contract show that within the contemplation of the parties performance by the defendant would afford the plaintiff a chance to profit from the production of discovered minerals?

Enough has already been said to show that the fact is wholly without controlling significance that in case of the discovery of valuable minerals the profit of the defendant may be as much as, or more than that of the plaintiff. As already stated, full performance of the contract may, within the contemplation of the parties, result in no profit to either plaintiff or defendant. Therefore, in determining what is the value or equivalent to plaintiff of the contract's performance, it ex-

tends no further than a completed well and the *chance* to profit from the discovery of minerals.

In the case first supposed A may have expected or hoped for a large profit from the land with the building thereon to accrue from the use of same, the rents to be derived, the enhancement of market value, etc., but he did not so contract with B as to bring such expectation or hope within the contemplation of the contract. Therefore, B could not, in answer to A's claim for damages, be permitted to show that if he had performed, such expectation or hope would not have been realized, or that plaintiff's land with the building would have been of no greater value than the land without the building, and that therefore A had suffered no damages. If the building in fact proved to be a monument to A's folly, he had the right to build such a monument. He had the right to contract with B to build it for him. If B breached the contract, A had the right to recover his damages measured by the usual rule; namely, the monetary equivalent or value of the contract's performance,—the reasonable cost of constructing the building. Just so in this case the plaintiffs had the right to have a well drilled on their land to the Desdemona sand. They could have paid the defendant in cash to drill the same; they could have conveyed him other land or have given him a lease on other land, but they just as certainly had the right to pay him as they did by the execution and delivery to him of a lease on the very land upon which the well was to be drilled. In the cases supposed and in this case the consideration was an executed consideration. Of what possible significance is it that in the latter case plaintiffs' profit from possible production would not have been as much as if the consideration had been something else, as for instance a lease on other land, with the result that all interest was retained in the particular land? That could be no concern of the defendant. His obligation, it must be kept in mind, was not to procure production but to drill a well; not to produce a profit, but at most only the *chance* of a profit. If he could fully perform his contract without there being any production, as manifestly was the case, how can the question at issue be affected by the fact that, if there had been production, plaintiffs would not have profited to the same extent or in the same proportion as if, instead of giving him a lease on the particular land, they had paid him in some other way?

It has been argued that, if as damages, plaintiffs be allowed to recover the reasonable cost of drilling the well, then they will have all the oil and gas, if any, in the land, and their damages besides. It is suggested that this would violate the rule that "a plaintiff is not to be put in a better position by a recovery of damages for the breach of a contract than he would have been in if there had been

performance." 17 C. J. p. 848, § 168. It is, we think, an entirely erroneous notion that such is the effect of such holding. Gwynn v. Wisdom, supra, illustrates a case where the allowance of such damages would have that effect. The very nature of the claim for damages in itself shows an election not to forfeit the lease. If, however, the lease terminated by limitations therein, such in no proper sense constitutes a taking back by plaintiffs of the minerals conveyed. If the plaintiffs had themselves drilled the well when defendant breached his obligation to do so, and had discovered valuable minerals, defendant, unless in the meantime the lease had terminated by reason of some limitation therein, and not by any act of the plaintiffs, would have owned the lease, and according to its terms would have profited by such production. If the lease had terminated by a limitation inhering in the nature of the estate granted by the lease, the result would have been no different than if the consideration had been a lease on other land which had so terminated but which land subsequently proved to be productive. Plaintiffs' subsequent right to the land, including the minerals, would no more in one case than in the other have been a taking back of the consideration given for the defendant's obligation.

The validity of these conclusions can in no way be affected by the fact that the lease given as a consideration for the drilling obligation may have had only a nominal value. It is sufficient, as we have before pointed out, if it would support the defendant's promise and make of same a contract obligation. If the lease had only a nominal value, that fact would show, or at least strongly suggest, that the defendant had valued his own chance of profitable production at a minimum equal to the cost of drilling the well. From this fact we concluded on rehearing in Curry v. Texas Company, supra, that such valuation should constitute the presumptive value of plaintiff's chance and place upon defendant the burden of proving to the contrary. But this investigation has led us to the conclusion that we were in error and that our determination of the question in the original opinion in that case was correct. We now see that the rule suggested in the opinion on rehearing in the Curry Case, if sound, could not be applied in any case where the lease, regardless of the drilling obligation, had a substantial value. In any such case, since in any event the lessee would be getting the value of the lease, it could never be said that the reasonable cost of drilling the well represented his valuation of the chance of profitable production. Nor should the plaintiff be bound by the defendant's valuation of such chance, when, as we have endeavored to show, the law provides a different and better rule.

Now let us examine for a moment the theory that the proper measure of damages is the

value of the royalty that would have been received by plaintiffs. If it be conceded that there may exist situations where proof could be made that royalty would be received, and the value thereof, it certainly must be admitted that such instances would be comparatively few. It never could be done where no wells had been drilled in the particular vicinity. The utmost claim of reputable geologists and petroleum engineers is that they can point out localities where the *chances* of obtaining production are more than ordinarily favorable or unfavorable. They do not pretend to say that they can tell that oil or gas will be found at any particular point. Then how is it to be shown that damages had resulted from the breach of an obligation to drill a well, and the amount thereof? We submit that it cannot be done except by substituting a jury's mere guess for the certainty which the contract's performance provided. Suppose that, in a case where the undisputed evidence showed that the reasonable cost of drilling a test well in a section where no well had ever been drilled was $2,000, the jury guessed that the value of royalties that would have been received but for breach of the obligation to drill was $25,000. This would be no impossible case. Would any court give judgment for that sum? If not, any attempt to limit it would be tantamount to an admission that a wrong measure of damages was being employed since it must thus needs be corrected. If in such case the full value of the royalty was allowed as damages and judgment rendered for $25,000 for the royalty on the minerals never produced but still remaining in the ground, and the lease terminated *as it* probably would before any minerals were discovered, how could the lessee ever get the minerals upon which he had by the judgment been forced to pay royalty? The defendant would have no lease. The plaintiff could undoubtedly make a new lease to a third party. The third party would certainly be entitled to the minerals. We cannot believe that we are to become finally committed to such an unnecessary, ineffective, and unjust rule when the established rule is, as we have endeavored to show, both applicable and effective.

We do not believe that we should regard the decision in Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, 60 A. L. R. 936, as having determined the question to the contrary. In that case there was an obligation like the one here; namely, to *drill a* test well. But that obligation was performed and was therefore not involved in that case. The obligations involved in that case were those that were contingent and conditional upon the result of the performance of the obligation to drill a test well. Manifestly there could have been no obligation to drill offset wells, or to reasonably develop until production had been obtained. Possibly these obligations may be governed by different rules, because manifestly something different from a mere chance to profit by the discovery of valuable minerals was by the very terms of the contract within the contemplation of the parties.

We shall not undertake to point out the nature of such differences, nor even to express an opinion that they are such as to call for application of a different measure of damages than we hold to be correct herein. We merely mention the fact by way of explanation why we cannot accept the decision in the Barker Case as foreclosing the question involved in this. It is our view that the parties themselves, by their contract, prescribed the test by which it was to be determined whether or not the drilling of a well would have resulted in profitable production and that therefore the trial court should not have heard testimony necessarily in the nature of speculations of the witnesses as to whether there would in fact have been any minerals produced.

In our opinion and for all of the reasons discussed, the judgment of the trial court was erroneous; that judgment should have been rendered for the plaintiffs for the sum of $8,000, by reason whereof said judgment should be reversed and here rendered.