## TAUBERT et al. v. EARLE.

### No. 13963.

Court of Civil Appeals of Texas.

Fort Worth.

Oct. 13, 1939.

Rehearing Denied Nov. 10, 1939.

Slay & Simon, of Fort Worth, for appellants.

Alexander & Bird and Massingill, Belew, Hill & Paddock, all of Fort Worth, for appellee.

BROWN, Justice.

This is a suit for damages which arose over the failure of appellants to comply with a drilling contract covering a small tract of land near the Bryson Townsite pool, in Jack County, Texas.

It must be conceded that the territory is what is known as a semi-proven area.

Appellee pleaded every conceivable measure of damages, to-wit, the cost of drill-

ing a well, the value of his oil payment, provided for in the drilling contract, and the loss of his portion of the probable production, had the well been· drilled.

Since our Supreme Court has spoken in Fain-McGaha Oil Corporation v. Owens, 132 Tex. 109, 121 S.W.2d 982, and cited with express approval the opinion in Guardian Trust Company v. Brothers, Tex. Civ.App., 59 S.W.2d 343, 346, writ refused, we take it that the last mentioned measure of damages is all that may be considered here.

In the "Brothers" case, the following was said: "In the opinion in the former case [Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, 60 A.L.R. 936], after quoting from many decisions holding that the best evidence of which the subject will admit is reasonable, *and that expert witnesses acquainted with the field could testify with reasonable accuracy as to the loss in oil and gas production* suffered by the lessor by the lessee's failure to perform his contract, the rule for measuring the damages is announced in this plain language: 'The amount and value of oil or gas production, obtained or obtainable through reasonable diligence, *must be definitely alleged, and must be proven with reasonable certainty before damages may be allowed for breach of an express or implied covenant to continue the production of oil or gas, whether such damages result from failure to produce oil or gas or from loss of same by drainage.*' "

We do not believe that the evidence relied upon by appellee (plaintiff below) is sufficient to meet the rule ·so laid down.

The instrument which forms the basis for the suit by Earle is:

"May 31st, 1937.
"Mr. and Mrs. E. S. Earle
"Fort Worth, Texas.
"Dear Sir and Madam:

"With reference to the Mrs. D. A. Nichols 4-acre tract of land northwest of the townsite of Bryson in Jack County, Texas, upon which either or both· of you own an oil and gas lease, beg to advise you that, for a valuable consideratian already received by us, we agree as follows:

"That after sixty (60) days from the date hereof, at your demand, we will drill a well at our sole cost and expense, on the west 2½ acres of the 4-acre tract to the Bryson sand, using reasonable diligence and dispatch, unless said 2½ acre tract of land has been condemned within said sixty day period by an offset well; and by the word 'condemned' is meant that an offset well has been drilled within said sixty day period which is not capable of producing as much as thirty (30) barrels of oil per day for ten consecutive days after it has been completed. It being understood, however, that if no such offset well has been completed within said sixty day period, that then and in that event after said sixty day period, we will, on your demand, drill such well on said 2½ acre tract irrespective of the completion of any offset well. It is understood, however, of course that prior to the time that we are required to drill said well that you will assign your oil and gas lease on said 2½ acres to us; but in said assignment to us it is further agreed that you are to reserve an oil payment of $6000.00, payable as follows:

"Out of ¼th of ⅞ths of the production, as long as the well flows ªnaturally. If, as, and· when the well ceases to flow naturally before the $6000.00 has been received by you, then your oil payment shall be out of ¾₁₆ths of ⅞ths of the production for a period of one (1) year after the date the well has ceased to flow naturally; and then out of ⅛th of ⅞ths of the production until you have received the full sum of $6000.00 in the manner and from the sources above mentioned. It being specifically understood that if· in the event the well does not flow naturally upon completion and it is necessary to place same on pump at the time of completion, the oil payment is to be cut of ¾₁₆ths of ⅞ths for a period of one (1) year from completion, and then out of ⅛th of ⅞ths until the full sum of $6000.00 has been received by you.

"It is understood too, that said payment of $6000.00 shall be in the nature of an overriding royalty and there shall be no personal obligation on the part of us to pay you said $6000.00, and no obligation on your part to pay any of the expenses whatsoever in producing said oil.

"It is further understood that we are to have an option on the balance of said 4-acre tract, which option must be exercised by us within sixty (60) days from the completion of the well above provided for.

"Our contract as to the balance of said 4-acre tract shall be on the same terms and conditions as on the 2½ acre tract, with the exception that the oil payment shall be $5000.00 instead of $6000.00, and

with the further exception that as to the balance of said tract we will commence drilling said well immediately, upon demand by you, after said option is exercised.

"Very truly yours,
"Taubert & McKee
"By: (Signed) Jesse McKee
"(Signed) Ed Taubert
"Accepted this 2 day of June, 1937.
"(Signed) E. S. Earle."

The oil and gas lease which was to be assigned is in ordinary form. It does not specify any depth to which the well must be drilled, and the following clauses appear therein: "It is agreed that this lease shall remain in force for a term of one year from this date, and as long thereafter as oil or gas or either of them is produced from said land by lessee." "In addition to the cash bonus paid, Lessors, or their order, are to be paid $250.00 per acre in oil out of 1/16th of 7/8ths of the oil produced from said 4 acres, if, as and when produced."

The lease is dated January 6th, 1937.

It appears that a well was drilled on the above mentioned 4-acre tract in October, 1928, known as the "Shaw well", and that it was abandoned shortly after it was completed, on the southeast portion of the said tract.

At the risk of being tedious, we think it best to give the substance of the testimony of some of the witnesses who were produced by appellee for the purpose of giving the jury some facts about the "Shaw well" and those on tracts lying in different directions from the 4 acre tract involved in this suit.

Mrs. D. A. Nichols, who executed the lease and who lives on the land, said that she saw the "Shaw well" flow when it came in, but when asked, "How long was it then before they plugged and quit the well?" she said: "I don't know how many days, but just a few." She further testified that she did not know whether they got one barrel of oil out of the well, or 100 barrels; that she never received any payment for royalty, "but the man said we should. He said there were 80 barrels of oil in the pipe line." She testified that "they" told her "they had a good well".

This witness gave no direct testimony concerning wells, near or adjacent to the 4 acre tract.

The next witness was W. F. Manley, a son-in-law of Mrs. D. A. Nichols, who testified concerning the "Shaw well": "Q. Just tell the jury what you saw at the time with reference to seeing oil come out of the well. A. I helped pull the casing out of the well. When we pulled the casing the well flowed and the well was flowing when they stopped it up and condemned it; that is about all I know about it." He said further, that it was flowing when they pulled the casing out and it was flowing when they plugged it; that when it "came in" it flowed half way up the derrick for three or four minutes and then shut down, and "that it gradually quit flowing in time."

This witness did not know how "thick" the oil-bearing sand was.

When asked about nearby wells, we find the following:

"Q. Do you know anything about these recent wells * * * I mean by that, within the last two years, one to the west and one to the east of this four acre tract? A. No, I don't know much about them.

"Q. Did you work on them? A. No.

"Q. You don't know whether they are dry or not? A. No."

This witness said he had been in the oil fields for some time; that he is 33 years old, and had seen many oil wells brought in.

On this predicate, outlined above, he was asked if he had formed an opinion about the production of the "Shaw well", and having replied in the affirmative, and when asked to give his opinion, said '50 or 75 barrels per day.

Before being permitted to so testify, his qualification as such expert witness was challenged and the court, after retiring the jury, ascertained the following facts: That the witness had never studied geology, but said he "knew something about wells", and that the well would have made 50 barrels "if it had been taken care of"; he said he did not know how "thick" the sand was, but said it was a foot and six or seven inches "thick", at least, although he did not see it. He further told the court that in his opinion the "Shaw well" might have been good for 20 years, "maybe, and maybe not 30 days". He further testified that there were, at the time he gave his testimony, wells "on the townsite" under pump, and he did not know what they were pro-

148

ducing; he "hadn't been down there to see them."

When the trial court overruled the objection to this layman's testimony and the jury was brought back, he was asked: "Do you know the wells in the townsite in this Nichols tract of land and how long they had been producing?" And he answered: "Yes, I know about them", and then this question was propounded: "Q. From your knowledge of the wells and the field there and from your general knowledge of the lease and of the oil business, how long, in your opinion, would a well on this D. A. Nichols tract produce oil?" Objection was duly made to the question, same was overruled, and this further question asked: "How long do you think a well there would have produced oil if it were properly brought in?" and he answered: "According to other wells around close to it it would have produced 8 or 10 years; they are doing it now."

On cross-examination this witness said he was not a geologist; that 10 feet of sand would "make a well", but that neither one foot nor two feet of sand would "make a well". Counsel then proceeded to test this witness' knowledge of the "surrounding wells" and showing the witness a map, the witness said the nearest well to the 4 acres tract is the Tidwell-Chambers well, 1701 feet away. He was asked: "How much oil has that Chambers well made?" He answered: "I don't know." And he did not know whether it was then shut down. He was next questioned about the Taubert & McKee well which is south of the 4-acre tract. He said he did not know about its production or whether or not it is now producing or ever did produce oil. Being asked about the K. Bryson well, "How much did that well produce?" he answered, "I don't know. I am working and don't go around seeing about those wells." He was just as indefinite about the Target Drilling Company's Williams well on the Nichols tract. He did not know anything about its production and "had not been about it." He finally said he was not talking about the wells inquired about, he was "talking about the wells north of town." This witness was then asked: "How far is that pool up north that produced ten years?" And he answered: "About a mile and a half from the Harper lease, and on the Prairie lease there are some wells that have produced not over half a mile, they produced 6 or 7 years and they were closed down." This witness told the court that, "Oil runs like water in streams and not in lakes." He said his opinion of the "Shaw well" was based on the wells on the Prairie lease north of town and on the L. C. Harper well.

We fail to find where this lay witness has testified to any fact concerning either the "Shaw well" (which was on the 4 acres in controversy) or concerning any other well in the neighborhood that could possibly give the jury any definite or approximately correct data from which the jury could ascertain what a well drilled on the 4 acre tract would in all probability have produced.

The remaining plaintiff's witnesses, J. W. Cullers, J. M. Box, C. L. Jones, W. L. McCloud, C. C. Chambers, L. H. Roberts, J. W. Kinder and plaintiff, E. S. Earle, all gave testimony quite as indefinite as that outlined by us as coming from the witness Manley.

When this instrument, on which appellee relies, was written the makers must have known something of the conditions in that particular area. This oil payment of $6,000 which was to be paid to appellee, after the original lessors were paid $1,000 out of oil produced and sold, provides that the payment shall be made out of ¼th of ⅞ths of the production, as long as the well flows naturally. And if the well ceases to flow naturally before the $6,000 is paid appellee, then his payments should come out of ³⁄₁₆ths of ⅞ths of the production for one year after the well ceases to flow naturally, and then out of ⅛th of ⅞ths of the production until the entire sum of $6,000 is paid. The agreement then further provides that if the well does not flow naturally when completed and it is necessary to place same on a pump, the oil payment is to be out of ³⁄₁₆ths of ⅞ths for a period of one year and thereafter out of ⅛th of ⅞ths until the entire sum is paid.

Proof even from plaintiff's witnesses shows that the wells in the vicinity of the 4 acres tract are short-lived.

While the language we quoted from, in the leading cases, speaks of "expert witnesses acquainted with the field", we do not believe that is the sole manner in which satisfactory proof could be made.

What we mean to say is that we believe proof may be made by lay witnesses

—non-experts—provided they can and do testify to facts.

Let us illustrate our meaning. If witnesses are produced who testify to whether or not the wells surrounding, adjacent or near to the tract in question, flowed when completed, how long they flowed and how much they produced, from their completion until they ceased to flow, and how much they produced on the pump; or whether or not such wells did not flow, but were put on the pump and how much they produced, after completion, and how long they actually produced, and the amount of production, such testimony, together with proof of the location of the tract in question, could be said to raise an issue of fact for the jury to say what production could be reasonably expected from the tract in question.

■ But this was not done. We have carefully read all of the plaintiff's testimony and we do not believe that it is sufficient for a jury to adopt as a basis on which to return a fair verdict. We find no testimony that tends to establish the essential facts "with reasonable certainty."

In our opinion, no lay witness testified to facts, or laid any sufficient predicate whereby such witness showed himself qualified to give hi. opinion as to what a well on the 4-acre tract would produce, or how long it would produce.

In contrast to the plaintiff's situation, the defendants—appellants here—introduced witnesses familiar with the wells in that neighborhood whose testimony tended to show that, by comparison, the 4 acres in controversy, in all likelihood, would not yield an oil well producing oil in paying quantities, and they also produced a trained petroleum engineer who testified that he was familiar with the logs of the wells in that vicinity—the very wells on whose existence the plaintiff depends for evidence to support a recovery of damages—and who has made a survey of the territory, and this expert said in his opinion the Nichols tract would not make a commercial producer.

We have "put the cart before the horse" in this opinion, but we want to put what we believe to be the controlling issue out in front.

This cause was tried to a jury and nine special issues submitted.

To the first issue the jury found that appellants agreed to drill the well on the 2½ acres out of the 4-acre Nichols tract as a part of the consideration to be paid to appellee for the assignment to appellants of a certain lease on a 43-acre tract owned by one Box; to the second issue the jury found that the 2½ acre tract was not condemned within the 60 day period by any offset well which was not capable of producing 30 barrels of oil continuously for 10 days; to the 3rd issue the jury found that had appellants drilled a well on the 2½ acre tract, the lease on the remaining 1½-acre tract would have been worth $264 per acre; to the 4th issue the jury found that the reasonable cash market value of the $6,000 oil payment retained by appellee, would have been worth $2,834, if appellants had drilled the well contracted for; to the 5th issue the jury found that the oil and gas lease on the said 1½ acres remaining in the 4-acre tract, when appellants refused to drill the well, was worth $236; to the 6th issue the jury found that the cash market value per acre of the lease in question, at the time appellee demanded that appellants drill the well, was $210 per acre; to the 7th issue the jury found that had appellants drilled the well appellee would have received the sum of $2,834 out of the $6,000 oil payment; to the 8th issue the jury found that an oil well producing oil in paying quantities would have been discovered if appellants had drilled the well to the Bryson sand; issue No. 9 and the answer are as follows: "Find from a preponderance of the evidence what amount of money, if any, if paid now, will reasonably compensate the plaintiff, E. S. Earle, for the failure on the part of the defendants, Taubert and McKee, to drill the well to the Bryson sand on the west 2½ acres of the 4 acre tract in question?" Answer: "$3,230.00."

Appellee having pleaded that the contract on which this suit is brought was a part of the same transaction involving the above mentioned 43-acre tract, and that the contract to drill was a part of the consideration for the contract covering the 43-acre tract, appellee prayed that a lien be established against appellants' interest in said 43-acre tract and that same be foreclosed to satisfy such judgment for damages as he may obtain.

On the verdict and pleadings the trial court rendered judgment jointly and severally against Ed Taubert and Jesse Mc-

Kee for the sum of $2,834, decreed a lien on the said 43-acre tract and foreclosed same.

Taubert and McKee have appealed, and the brief contains forty-five assignments of error, but appellants have presented their points through thirteen propositions.

This opinion is rather lengthy up to this point and, in the interest of brevity, we will not attempt to discuss each point.

The first point raised contends that the defendants overwhelmed the court with material and expert testimony of persons who were acquainted with the field, showing that a commercial producer could not be drilled on the land in question, and the plaintiff failed to introduce evidence of probative value in his behalf; therefore the trial court erred in not granting defendants' request for a peremptory instruction.

While we are inclined to the opinion that the trial court should have given such charge, nevertheless, on this appeal, where it appears that the plaintiff did not fully develop his case, we would be inclined to reverse and remand rather than reverse and render, were there no other assignments of error warranting a rendition.

■ The second proposition attacks the action of the trial court in permitting the witness, Manley, who is a mere oil field "roustabout" and "tool dresser", to give his opinion on whether or not a well drilled on the tract in question would be a producer, how much it would produce and for what duration.

We conclude that this point is well taken.

The third proposition contends that the letter, or instrument, on which the plaintiff relies for a recovery, shows to have been executed for a past consideration and is therefore not enforceable.

We do not think the point well taken.

■ It is always permissible to prove the true consideration, in a case such as this, and we believe that the testimony establishes the fact that the contract on which this suit is brought is a part of the contract involving the 43 acre tract mentioned above.

The fourth proposition is an important and serious one. It contends that the letter, or instrument, is not enforceable because it is in violation of Article 3995 (Rev.Civil Statutes of Texas, 1925), namely, the Statute of Frauds.

The first case cited to support this point is Cantrell v. Garrard, 240 S.W. 533, by the Commission of Appeals, adopted by the Supreme Court, and followed by the cases of Anders v. Johnson, 276 S.W. 678, and Fagg v. Texas Co., 57 S.W.2d 87, both by the Commission of Appeals. We find the following language used by the Commissioners in the "Cantrell" case [240 S. W. 534]: "A contract for the sale or conveyance of the lease under consideration was required by our statutes to be in writing. R.S. Arts. 1103 and 3965. The lease itself constituted the subject-matter of the contract. The land upon which the lease was given was one of the essential elements of description, but not by any means the only one. The term for which the lease was to run, the time for beginning drilling operations, the time and amount of payments in lieu of drilling operations, and the amount to be paid for gas produced, were also essential elements of description. * * * The description of said lease, the subject-matter of the contract sued on, was insufficient to identify the same, and therefore insufficient to meet the requirements of the statutes cited, and defendant in error was not entitled to recover for the breach of such contract."

In this opinion by the Commissioners, the following language is quoted from Jones v. Carver, 59 Tex. 293: "The rule is that a written agreement for the sale of land must contain the essential terms of a contract, expressed with such certainty that it may be understood without recourse to parol evidence to show the intention of the parties; and no part of such contract is more essential than that which identifies the subject-matter of the agreement."

What is the subject matter of the agreement, on which the plaintiff below relies? Obviously an oil and gas lease which the plaintiff desired to convey to the defendants below for some certain consideration.

An examination of the contract, sought to be enforced by appellee, discloses that the following words, only, are used to describe the "subject matter" of such contract: "With reference to the Mrs. D. A. Nichols 4-acre tract of land northwest of the townsite of Bryson in Jack County, Texas, upon which either or both of you own an oil and gas lease, beg to advise you that, for a valuable consideration al-

ready received by us, we agree as follows:"

There is not found in this instrument any further description of the lease, and no reference is attempted to be made to any lease executed and filed for record. The lessors are not attempted to be named, nor is the lessee. The date is not attempted to be given, neither is the term for which it is to run, nor the time for beginning drilling operations, nor the payments which are provided for therein.

We do not believe that the contention of appellee to the effect that the instrument sued upon is not one for the sale of an oil and gas lease, but is a contract to drill a well, is sound.

You cannot divorce the agreement to drill a well, under and by virtue of the terms of the lease which confers the right to so drill, from the lease itself. The instrument sued upon shows on its face that appellants were to drill a well and to make certain payments, out of oil produced, for a sale and conveyance to them of the said oil lease.

Under the decisions noted, we hold that the letter, or contract, is wholly unenforceable, and that the appellee cannot recover in a suit predicated thereupon.

A discussion of the remaining nine propositions is pretermitted by us, because of the conclusions reached.

For the reasons stated, the judgment of the trial court is reversed and judgment here rendered for appellants.