## POWELL et al. v. DANCIGER OIL & REFINING CO. OF TEXAS et al.

### No. 13960.

Court of Civil Appeals of Texas. Fort Worth.

Nov. 10, 1939.

Rehearing Denied Dec. 8, 1939.

Hardwicke & Cheek, of Fort Worth, for appellants.

Chas. L. Morgan and W. C. Hock, both of Fort Worth, Ringolsky, Boatright & Jacobs, of Kansas City, Mo., and Morgan, Culton, Morgan & Britain, of Amarillo, for appellees.

BROWN, Justice.

Appellants here were the plaintiffs below, and they are the surviving wife and the children of the late G. N. Powell. The suit is brought for damages against appellees, resulting from their failure to develop with reasonable diligence a 320 acre tract of oil land, located in the Panhandle portion of the State of Texas, in Gray County, Texas.

It appears that G. N. Powell and his surviving wife, Sarah Powell, being the fee owners of the lands in controversy, conveyed same, on July 22, 1919, to one J. M. Eldridge, by a general warranty deed, but reserved and retained unto themselves, their heirs and assigns an undivided 7/8ths interest in and to all minerals, lodes, veins, oil and gas and other mineral deposits found or to be found under or within the lines or area of said land, and thereafter, being the owners of such 7/8ths undivided interest in all of such minerals, they did, on July 24, 1929, convey such interest to Danciger Oil & Refining Company of Texas, a corporation, in and under the northeast quarter and the southwest quarter of Section 28, Block B–2, Public School Lands, Certificate 15/3165, issued to the H. & G. N. R. R. Co., situated in Gray County, Texas.

This instrument provides for a cash consideration and for certain sums of money to be paid out of oil, gas and casing head gas that may be produced, saved and sold from the interest of said grantee in such lands, and as a part of the consideration for such conveyance, said appellee covenanted and agreed with said grantors to deliver to the said J. M. Eldridge and his heirs and assigns the undivided 1/8th of all oil, gas -and casing head gas that may be produced and saved from the lands and such instrument of conveyance expressly excepted and reserved to the said grantors and to their heirs and assigns an overriding 1/8th interest in and to all of the oil, gas and casing head gas in and under and that may be produced from said lands, and the said grantee covenanted and agreed to permit delivery to the credit of the grantors, free of cost, in the pipe line to which it may connect its wells, an equal 1/8th part of all oil produced, saved and sold from the conveyed premises, and to permit the payment to said grantors of 1/8th of the net proceeds derived from the sale of gas produced and used off of the premises and to permit the payment to such grantors for gas produced from any oil well 1/8th of the net proceeds derived from the sale of gas delivered to a pipe line for the time during which such gas is used, and said instrument further provides that in the event grantee should use the casing head gas itself for the manufacture of gasoline, or other purposes, then the grantee undertakes to pay grantors on the basis of 1/8th of the customary and prevailing price paid by other casing head plants in the oil fields surrounding the premises involved.

The instrument further stipulates that the grantee shall make reasonable provisions in the way of storage tanks to take care of flush production and to connect the well or wells with such storage tanks, and in the event the storage tanks shall prove insufficient to take care of the flush production, the grantee agrees to make reasonable efforts to get the flush production under control, and said instrument further recites that the grantee expressly covenants and agrees that it will protect the premises conveyed against all off-set wells drilled within 330 feet of the property line of the premises conveyed. The instrument further provides that the grantee shall have a right to use, free of cost, gas, oil and water produced on the lands for all operations thereon, but excepts to the grantors their water wells. The instrument further provides that the contract evidenced by the instrument shall extend to and be binding upon the heirs, executors, administrators, successors and assigns of the respective parties, and it stipulates that the privilege of assigning is expressly allowed to each of the parties.

The last paragraph of this instrument stipulates that it is entered into in pursuance of the reservation in the deed of conveyance to J. M. Eldridge, which was expressly referred to in the fore-part of the instrument, and that the contract is made subject thereto.

The allegations of the petition on which appellants went to trial are clear, concise and specific, and make out a case of failure to reasonably and diligently develop these two quarter sections of land, unless and until the said grantees, who were defendants below, can show what we shall term a reasonable excuse in law for not having drilled more wells than have been already drilled on the premises.

The following facts are set forth in the pleadings and are undisputed in the record.

In October, 1929, defendants drilled and completed three wells located on the northeast quarter of Section 28, which wells were completed as commercial oil wells with initial daily potentials of 400, 200 and 700 barrels a day, respectively. During the four year period, beginning October, 1929, and ending October, 1933, said three

wells produced a total of 402,549 barrels of oil.

In September, 1929, defendants drilled and completed one well on the southwest quarter of Section 28, which well had an initial potential or producing capacity of 1070 barrels a day. For the approximately four year period ending October, 1933, it produced 406,705 barrels of oil.

Plaintiffs alleged that during said period each of said wells produced oil and gas in paying quantities and in an amount more than sufficient to enable defendants to realize a large profit from the operation of said wells after all of the expenses of drilling, completing, equipping and operating the same were taken care of; and that the character and productivity of said wells were such as to establish definitely and to defendants' knowledge that said two quarter sections of land were underlaid with extensive and continuous deposits of oil and gas. That had defendants complied with their obligation to plaintiffs, they would have continued to develop said tracts of land with reasonable diligence by drilling, completing and operating additional wells thereon; and that to have complied with their obligation to plaintiffs, they would have drilled and completed at least one well to each 10 acres, or a total of 16 wells on each quarter section. That had such additional wells been drilled by defendants, each of said wells would have produced oil and gas in paying quantities and in an amount more than sufficient to have paid defendants a reasonable profit on the operation of said wells after all the costs of drilling, equipping and operating same had been taken care of.

Plaintiffs alleged that the additional wells, if drilled prior to November, 1933, as defendants were obligated to do, would have had an average potential or producing capacity of 600 barrels per day, from the production from which wells plaintiffs would have been entitled to receive 1/8th of the total oil, gas and casing head gas produced as an overriding royalty.

Notwithstanding all of such facts, defendants waited more than five years before they drilled another well on said land. In the year 1935 they drilled a fourth and a fifth well on the northeast quarter of Section 28, both of which wells had large potentials, and produced oil and gas in paying quantities. The initial potentials of these two wells were 523 and 1635 barrels a day, respectively.

As to the southwest quarter of Section 28, and in spite of the production of 406,000 barrels of oil from one well thereon in a four year period, defendants waited eight years, or until the year 1937, before drilling another well thereon. Said well was completed with a large potential and produced oil in paying quantities, having a potential of 243 barrels a day. In the year 1938, defendants completed a third well on the southwest quarter of Section 28, after this litigation was instituted, which well was likewise a well capable of producing oil and gas in paying quantities, and had a potential of 129 barrels a day.

The pleadings allege and the facts show that the wells on the northeast quarter of Section 28 down to May 1st, 1938, have produced a total of 615,938 barrels of oil. For the same period, the wells on the southwest quarter have produced a total of 450,249 barrels of oil.

Plaintiffs alleged that had defendants complied with their obligation to drill and complete at least 16 wells on each quarter section of land, said wells would have produced and would have been permitted by the Railroad Commission to produce during the period beginning November, 1933, at least 1,230,000 barrels of oil from each quarter section of land, which oil could and would have been marketed at the posted price for oil from said field, which averaged approximately 97 cents a barrel for said period. Plaintiffs sued for the difference between the amount of royalty they actually received for the production from said two tracts of land and the amount of royalty they should and would have received, had defendants complied with their obligation to develop said tracts with reasonable diligence, which damages amounted, according to the allegation, to $123,525 as to the northeast quarter of Section 28, and $144,988 as to the southwest quarter of Section 28. Said sums were alleged to be 1/8th of the proceeds which would have been received from the additional oil which would have been produced and saved from said two quarter sections of land, beginning with November, 1933, if defendants had complied with their obligation to plaintiffs.

Defendants filed a general demurrer to plaintiffs' petition which was by the court overruled. Defendants also filed a special exception to the effect that no implied covenant to adequately develop the premises was shown to exist. This special ex-

ception was overruled, so the question of the existence of defendants' obligation to plaintiffs is not involved in this appeal.

Defendants also filed other special exceptions which will be noted later, a general denial and some special pleadings which are not here material.

At the conclusion of the evidence, the court overruled a motion for directed verdict and submitted the case to the jury. The first question submitted was whether defendants had developed said tracts of land with reasonable diligence. The jury was in disagreement on its answer to this question. The trial court thereupon, instead of declaring a mistrial, instructed the jury to return a verdict for the defendants, and a judgment was entered for the defendants, that plaintiffs take nothing, based on said instructed verdict.

Thereafter, plaintiffs seasonably filed their motion and amended motion for new trial, which amended motion for new trial was by the court considered and overruled; to which action of the court plaintiffs in open court excepted and gave notice of their appeal to the Court of Civil Appeals for the Second Supreme Judicial District. Appeal bond was duly and seasonably filed by plaintiffs, which bond was approved.

This appeal is therefore seasonably brought to this Honorable Court for review of the trial court's action in refusing to declare a mistrial after the jury was unable to agree in the case, and in refusing to accord to plaintiffs the right to have a jury pass on the controverted fact issues involved.

The question before us is: Did the plaintiffs—appellants here—adduce evidence sufficient to raise issues of fact for determination by the jury?

■ It is elementary that where the trial court gives an instructed verdict for one litigant, all of the evidence adduced by the opposing litigant must be taken by us as true.

We cannot agree with appellees in their contention that there is no covenant requiring development of the lands in question excepting one to drill offset wells—that there is no implied covenant to develop the lands.

■ This is said in Stanolind Oil & Gas Co. v. Christian, Tex.Civ.App., 83 S.W.2d 408, 409, writ refused: "It is true that drilling an offset well is in a sense developing the property. But the implied covenant to drill offset wells for protection of the property from drainage is a distinct obligation from the obligation imposed by the implied covenant to develop the property. They are two separate and distinct covenants. The express stipulation against, or the full performance of, the obligation of the lessee to develop the property will not relieve the obligation to prevent drainage."

■ In Grubb v. McAfee, 109 Tex. 527, 212 S.W. 464, 465, this is said: "The law implied the obligation from defendant in error to exercise reasonable diligence to continue drilling and mining operations on the land after oil was encountered in the first well"; and in Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, 29, the Texas Supreme Court said that the following proposition must be regarded as settled by repeated decisions of the Supreme Court: "Where a mining lease provided for oil or gas royalties, and failed to define the lessee's duty as regards development after discovery of paying oil or gas, the law implied the obligation from the lessee to continue the development and production of oil or gas with reasonable diligence." The opinion cites prior Supreme Court decisions; Benavides v. Hunt, 79 Tex. 383, 396, 15 S.W. 396; Grubb v. McAfee, 109. Tex. 527, 530, 212 S.W. 464; Texas Pac. Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 1035, 60 A.L.R. 936; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 1042, 60 A.L.R. 890.

Such pronouncements being the established law of this State, when the obligation arises under a mere lease that expires, as is the custom, after some stated period of time, unless the production of minerals, in paying quantities, is had by development within the leasehold period, how much more should it apply in the instant suit, where the grantors own 7/8ths of the minerals in and under the lands and have absolutely conveyed such interests to a grantee, retaining a 1/8th overriding royalty, and the purpose of such conveyance is shown, on the face of the mineral deed, to be that of effecting a development of the lands to the end that the owners of the minerals, might profit by receiving their overriding royalty.

In the first instance, the lessee has received a conveyance giving him the right, for a limited time, to develop the property and to receive the major portion of

the minerals if, as and when produced, while in the instant case, the grantors have absolutely conveyed, by warranty deed, all the mineral interests owned by the grantors, except the 1/8th overriding royalty that is expressly reserved.

We are of opinion that the implied covenant to develop the lands with reasonable diligence is present and there remains nothing but the question of whether or not the plaintiffs have adduced evidence sufficient to take the case to the jury.

This action arises over lands that are located within practically "proven territory", and we take it that the measure of damages is finally and definitely established by our Supreme Court, as is reflected in the opinion in Fain-McGaha Oil Corporation v. Owens, 132 Tex. 109, 121 S.W.2d 982.

We think the burden of producing evidence to raise issues of fact for a jury's findings was met by appellants in full measure.

We had occasion to say in a recent suit, Taubert et al. v. Earle, 133 S.W.2d 145, that we are of opinion that a litigant may make out a prima facie case of damages, in this character of suit, without producing testimony from experts. We base that conclusion on the premise that if it could be shown by even lay witnesses, who are acquainted with the facts, the actual condition of wells near and adjacent to the tract in controversy, such evidence would, in some cases, be sufficient for a jury to predicate a reasonable finding as to the existence of and probable production of oil in paying quantities.

But the appellants have done all that the decisions in Texas required of them. They introduced evidence showing, without dispute, the initial production and continued existence of every well drilled on the lands involved and on all lands adjacent or near to such lands, situated in every direction from the lands over which the suit arises, and then they produced an expert, educated and trained in such matters, who examined the "logs" of all such wells, and he testified that, in his opinion, the tracts of land in controversy are oil producing in their entirety, and he testified to what he believed, from the facts found by him, the average production would be per well, if the tracts were fully developed.

He was corroborated by other experts. Joseph Danciger, a vice-president of appellee, in charge of production, on cross-examination gave the following testimony:

"Q. You do not condemn any of this whole section, do you? A. I would not condemn it, but I would feel mighty shaky in drilling a lot of it.

"Q. All right, what part of it are you going to feel shaky about? A. When the granite is toward the east, the east half of that northeast quarter I think is a very hazardous place to drill.

"Q. All right, the east half of the northeast quarter? A. That is the way it looks to me, yes.

"Q. Now, the 'Magnolia' up here in Section 29 and section 30 are just as close to the east edge of the field as you are, aren't they, Mr. Danciger? Their wells in section 30 and in section 29 are in exactly the same position with reference to the east side of the field as is the east half of the northeast quarter? A. Yes, they may have good wells down there, but that would be no sign that we would have them, although, as I say, we might get some good wells. I don't know what is under there. It has been explained how erratic that stuff is. You might get a good well where you don't expect it or get a dry well or little bit of a well where you expect a big one. * * *

"Q. All right, now, Mr. Danciger, how much of it—you say you are very uncertain about the east half of the northeast quarter in spite of what the 'Magnolia' did up there immediately north of you? A. Yes, I would say that would be questionable, although I will say this, that if you drill there, you are liable to find some peculiar condition and get a good well there. I don't know. I can't tell.

"Q. What do you think about the west half of the northeast quarter? A. That looks better.

"Q. Does it look like you will get paying wells over there? A. Yes, it does. It looks like our chances would be better because it is closer in. I might be mistaken, but that is the way it looks to me."

Being interrogated about the southeast quarter of the very same section, Mr. Danciger said: "That don't look so hot to me", and proceeded to give his reasons, but promptly admitted that he had purchased royalty interests in the southeast quarter from several individuals, in the year 1936. He said he bought it because it was cheap.

It was shown by this same witness that his company owns a greater per cent of the oil in and under the northwest quarter than it owns in the two quarter sections involved in this suit, and that his company had drilled far more wells on such northwest quarter than had been drilled on the lands in controversy.

The witness said the difference in the percentage of oil had nothing to do with the difference in the drilling operations. He was then questioned about the southwest quarter, as follows:

"Q. Now, tell the jury where on the northeast, you have already excluded the east half of the northeast quarter, but where else, where in the southwest quarter will you tell the jury you would get a dry hole? A. Well, I don't know where you would get a dry hole. It may be that there would not be any of them dry. It may be that you would get little showings possibly, and it may be you would get good wells.

"Q. You just don't know, do you? A. Absolutely don't know.

"Q. The only way you can tell is by drilling, isn't it? A. Correct."

This witness admitted that if additional wells had been drilled on the lands in controversy after November 1, 1933, his company could have disposed of the oil, at the posted prices.

It was shown, by uncontradicted evidence, that the wells that have been drilled on the lands in controversy have produced oil in paying quantities.

The plaintiffs below, and appellants here, have met the test of the burden of proof as laid down by the Supreme Court of Texas in Texas Pacific Coal & Oil Co. v. Barker et al., 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936. We see no necessity in citing any other Supreme Court decision.

The burden of appellee's argument before us is that appellants having failed to produce a witness, or witnesses, who would testify that if a well is drilled "here" it will produce "so many barrels per day", and if one is drilled "there", it will produce "so many barrels per day", and if a well is drilled "yonder", it will produce so many barrels per day, the evidence, as adduced, is not sufficient to raise an issue for a jury's findings.

We do not believe a litigant is relegated to any such exactness in his proof. In the very nature of things, as pertain to oil production, such testimony is impossible.

We reiterate, the plaintiffs produced the best evidence available and this is all the law requires, if it be sufficient to raise the issues involved. We hold that it does and did raise the required issues.

We sustain the first, second, third and fourth assignments of error, complaining of the trial court's action in directing a verdict for the defendants below.

If appellants are entitled to recover damages because of the failure of appellees to develop the lands with reasonable diligence, the four year statute of limitations applies, Vernon's Ann.Civ.St. art. 5529, and the plaintiffs having sought to recover damages only from a period within such four year limitation, their pleading is proper and not subject to the special exception which was sustained by the trial court.

We believe the fifth and sixth assignments of error are well taken. Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890.

Appellees attempted to excuse their failure to develop the lands in controversy by offering evidence concerning economic conditions obtaining in the oil business and stressed an "over supply" of oil, making it unwise for them to engage in further drilling.

As against such defense, appellants sought to prove by the said Vice-president, Danciger, how many wells the defendant had drilled in the State of Texas since November, 1933. The trial court refused to permit this evidence to be adduced on the theory that it was "wholly immaterial", and the court said: "I sustain the objection. I think that would involve conditions existing elsewhere"; and, after these observations, the witness said: "Conditions in every field are entirely different, the potential is different, the price is different, conditions are different, costs are different, the depths are different." The trial court: "I sustain the objection." We believe the appellants were entitled to have this evidence before the jury.

It is true that appellees should be permitted to show how many such wells were drilled because operations were required in order to hold the leasehold interest, if there were any such, and how many

wells were drilled as "offsets", which were required of the lessee, if there were such, but it remains as a fact that stares one in the face, that the drilling of all wells not absolutely required served to further "glut" the market with over-production, and if it can be shown that appellees drilled wells during such period of time when they were not obligated to do so, this fact would most certainly tend to show that appellee's failure to drill on the lands in controversy was not caused by appellee's fear of "over-production", or because of general economic conditions prevailing in the oil industry at that time.

We sustain the seventh assignment of error. Freeport Sulphur Co. et al. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890.

For the reasons given, the judgment of the trial court is reversed and the cause is remanded.