COUNTY MANAGEMENT,
INC., Appellant,

v.

Thomas W. BUTLER, et al., Appellees.

No. 13718.

Court of Appeals of Texas,
Austin.

March 30, 1983.

Rehearing Denied May 11, 1983.

Robert M. Roller, Graves, Dougherty, Hearon & Moody, Austin, for appellant.

Gordon H. Rowe, Jr., Gardere & Wynne, Dallas, for Thomas W. Butler and Paul J. Stout.

Stephen H. Suttle, McMahon, Smark, Surovik, Suttle & Baskerville, Abilene, for Brittany Drilling Co.

Before PHILLIPS, C.J., and EARL W. SMITH and BRADY, JJ.

BRADY, Justice.

This is a suit for specific performance and damages. Trial was to a jury which awarded appellees Thomas W. Butler, and Paul J. Stout, six million dollars in damages for breach of contract. The district court entered a judgment for such sum and ordered specific performance and other relief against appellant, County Management, Inc.

On May 22, 1979, an agreement was entered between appellant and appellee, Brittany Drilling Company, under the terms of which appellant agreed to sell Brittany twenty-seven oil and gas leases situated in Lee and Washington Counties covering approximately 1500 acres of land in exchange for the payment to appellant of a certain amount of money per net mineral acre, the reservation of overriding royalties and the granting of an option to participate in a percentage of the working interests under the leases. Brittany then assigned the contract to Butler and Stout.[1] In their suit, appellees alleged that although they had substantially performed their part of the agreement, appellant nevertheless refused to perform its side of the bargain by failing to pay its share of cost and expenses for the wells in which it had working interests and by withholding certain key or critical leases which, among other things, precluded them from drilling in places where they desired to drill. The appellees sought specific performance of the contract for the part that was still executory and damages for the remainder.[2] The appellant filed its answer and a third party action against Brittany asserting that it was Brittany and not they who had breached the contract and asking the court to cancel the contract, reassign the leases to appellant and award appellant damages for the lost leases.[3]

Because of our disposition of this cause, we only need to decide the questions raised in appellant's points of error concerning the sufficiency of the evidence to support the trial court's award of six million dollars damages to appellees.

Apparently, at the trial, Butler and Stout took the position that appellant's failure to convey the Everee White Wade lease, as the contract required, prevented the timely drilling of a well on the earlier-conveyed Vaughn and Oliver leases due to Railroad Commission spacing regulations.[4] Consequently, the Vaughn and Oliver leases expired, and after Butler and Stout had reassigned them to County Management, County Management assigned them to a third party. This reassignment according to Butler and Stout caused them to suffer damages because they were not able to receive the expected profits from the sale of oil and gas which would have been produced from the lost well.[5] Proof of loss

---

1. The contract provided that Brittany could assign the contract to Butler and Stout without prior notification or permission.

2. Although this issue was not addressed at the trial, appellees' sought a monetary recovery under the rule that where a defendant has partly disabled itself from carrying out a contract he may be decreed to perform as much of the contract as he is still able and the plaintiff may recover a monetary award for the residue. *See English v. Jones,* 154 Tex. 132, 274 S.W.2d 666 (Tex.1955). *Work v. Wyche,* 344 S.W.2d 193 (Tex.Civ.App.1961, writ ref'd n.r.e.); *See also* 71 Am.Jur.2d, Specific Performance § 216 *et seq.* (1973); 81A C.J.S. Specific Performance § 196 *et seq.* (1977).

3. After both sides rested, the trial court granted Brittany Drilling Company's motion for instructed verdict against County Management on the third party action.

4. Butler and Stout did not specially plead that appellant's failure to convey the Everee White Wade lease caused damages from the loss of the Vaughn and Oliver leases. However, County Management never specially excepted to Butler and Stout's damage pleadings or otherwise pointed this out at trial; as a result, any error was waived.

5. It is not clear what theory of damages was used to justify proving lost profits. The appellees may have been using lost profits in the capitalization of income approach of proving market value, or they may have been seeking the recovery of lost profits as special damages. If we assume lost profits were used to show market value, there is also no discussion of the applicability of the rule that bars the recovery for the loss of the bargain in cases where the vendor cannot or will not convey title and there is no showing of fraud, bad faith, or a willful refusal to convey. *See Long v. Brown,* 593

involving undrilled wells, lost leases, and royalties are, by their very nature difficult, to show. Nevertheless, before a plaintiff can recover damages, he must prove with reasonable certainty the damages he suffered from the defendant's breach. *See e.g. Texas Pacific Coal & Oil Co. v. Barker,* 117 Tex. 418, 6 S.W.2d 1031 (Tex.1928); *Whiteside v. Trentman,* 141 Tex. 46, 170 S.W.2d 195 (Tex.1943); *Amoco Prod. Co. v. Alexander,* 594 S.W.2d 467 (Tex.Civ.App.1979), *modified,* 622 S.W.2d 563 (Tex.1981); *Taubert v. Earle,* 133 S.W.2d 145 (Tex.Civ.App. 1939, writ ref'd). When lost profits are sought as an element of damages, the plaintiff must necessarily show what those profits would have been. *Logan v. Elliot,* 61 S.W.2d 157 (Tex.Civ.App.1933, writ dism'd). The plaintiff can satisfy this burden through the introduction of evidence showing the initial and continued production of wells drilled on the lands in controversy (if available) and on other lands in the area. *Taubert v. Earle, supra.* A qualified expert witness should then be produced who, after examining the logs and other relevant information from the surrounding wells, gives an opinion as to the probability of obtaining production and the extent of such production on the land in question. *Wes-Tex Land Co. v. Simmons,* 566 S.W.2d 719 (Tex. Civ.App.1978, writ ref'd n.r.e.); *Taubert v. Earle, supra; Guardian Trust Co. v. Brothers,* 59 S.W.2d 343 (Tex.Civ.App.1933, writ ref'd.); *see also Vega Petroleum Corp. v. Hovey,* 604 S.W.2d 388 (Tex.Civ.App.1980, no writ). "Such matters as production costs, geological trends, proration, kind and quality of the oil and countless other items," where applicable, should also be referred to by the expert in making his opinion. *Payne v. Holmes,* 151 S.W.2d 359 (Tex. Civ.App.1941, writ dism'd).

■ The appellees called two expert witnesses in their attempt to prove their damages. The first expert testified about the probability of production and estimated the amount of oil and gas reserves. The second expert, testifying by deposition, estimated how much the lost leases would have been worth had Butler and Stout been able to drill using the reserve estimates provided by the first expert.

As for the first expert's testimony, the excerpts below illustrate why we must hold

---

S.W.2d 371 (Tex.Civ.App.1979, writ ref'd n.r. e.); *Butler v. Benefield,* 589 S.W.2d 778 (Tex. Civ.App.1979, writ ref'd n.r.e.); *Nelson v. Jekins,* 214 S.W.2d 140 (Tex.Civ.App.1948, writ ref'd). In any event, there were three estimates of value given by the appellees' valuation expert. The first estimate assumed drilling costs of $700,000, production of 328 barrels a day which would sell for thirty-five dollars a barrel, certain operating costs, an eight-year well life and a ten-percent discount rate which apparently is used by the industry. This gave a net present value for the leases of $5,541,984. The second estimate was based upon the expert's opinion that people were willing to pay about forty percent more than his estimated present value of a lease. In this case, the expert said the leases value would be up to $7,000,000 but he specifically said and one of the appellees' attorneys concurred that this figure did not represent the traditional fair market value of the lease since the buyer was "under a compulsion to buy." The third estimate, which was represented by the expert to be the traditional measure of fair market value, that is, the price which would be agreed upon by a willing buyer under no compulsion to buy and a willing seller under no compulsion to sell, was that the leases were worth $4,000,000. Apparently, the only difference between this and the first estimate was a change to the discount rate used by

taxing authorities. The following charge was submitted by the court on the issue of appellees' damages:

SPECIAL ISSUE NO. 8

From a preponderance of the evidence, what sum of money, if paid now, would fairly and reasonably compensate for the amount of actual damages, if any, which was suffered by Brittany or its assignee.

Answer in dollars and cents, stating one lump sum of money, if you find that any damages were suffered.

$ 6,000,000.00

Any claim that the charge submitted failed to properly instruct the jury on the correct measure of damages and the factors to be considered by the jury in determining the damages is waived by the appellant's failure to properly call the problem to the court's attention. *See e.g. Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535 (Tex.1981); *Tom Benson Chevrolet, Inc. v. Alvarado,* 636 S.W.2d 815 (Tex.App. 1982, writ ref'd n.r.e.); *Corpus Christi Bank & Trust v. Roberts,* 587 S.W.2d 173 (Tex.Civ.App. 1979), *aff'd,* 597 S.W.2d 752 (Tex.1980); *Pleasant Grove Builders, Inc. v. Phillips,* 355 S.W.2d 818 (Tex.Civ.App.1962, writ ref'd n.r.e.); *see* Tex.R.Civ.P.Ann. 279 (1977).

that the appellees did not prove their damages with reasonable certainty.

Q. All right. Based upon everything that you know from your past experience and your educational training and background and based upon the data that you reviewed, were you able to form an opinion to a reasonably geological certainty as to the probability of drilling a producing well at that location?

A. Of course, I think most everybody realizes a producing well can be anything from three to five barrels a day to four or 500 barrels a day. At the time, we knew the area was better than normal so we expected the odds were favorable that we would encounter a well with great amounts of oil and gas coming out of because of the area being what we thought to be a sweet spot based on other drilling in the area.

Q. So in addition to the seismic you looked at, you also looked at the surrounding area?

A. The area appeared to be and still today is—that area generally is the best in Lee County, for example.

Q. So then did you form some opinion as to the—to a reasonable degree of certainty, as to what kind of production you would expect from that well?

A. Yes, sir.

Q. Would you state to the Court and the jury, please, what your opinion was concerning the probable recovery out of that well.

A. Let me rephrase it. We're going on odds. We're not specifically—I'm not going to start out saying—I'm going to summarize what I would be looking for if we drilled a series of wells equivalent to this.

Q. All right.

A. We would be looking for a range of, we think highly economic well, almost in all cases. Although we have drilled a couple of essentially dry holes in the area. I would say, in general, the reserve that most engineering firms are utilizing in this area and at that time, was from 200 to a quarter of a million barrels of oil.

\* \* \* \* \* \*

Q. All right. So then, I'm trying to get a handle on the factors that you took into account when you reached that conclusion. One of the factors was what the seismic looked like.

A. The seismic indicated that we would drill a well there.

Q. All right. Other factors you took into account were wells that were drilled in the surrounding and the kind of production they were achieving?

A. Yes, sir.

Q. Since the fall of 1979—I'm sorry, since the time you made that selection known to Mr. Butler, have you generally kept up with the activity in the same general area and in Lee County?

A. Yes, sir.

Q. Has the subsequent activity in that same general area affected your opinion substantially or materially?

A. Yes, it has made the area appear to be more favorable. At that time we had—

Q. —More favorable, you say?

A. The wells—the reserves that we and the engineers are carrying now are higher than the engineers were carrying back in '79. Instead of if we were carrying roughly 150,000 barrels or 200,000, now, due to the results of monitoring the wells in the area, the average wells are in excess of a quarter of a million in this area.

Q. So then the subsequent activity, if your opinion was as you stated it from a range of 200 to 250 million—250,000 barrels of recoverable oil, the subsequent activity would have increased that range.

A. Yes, sir.

Q. And the range would now, based on what you believe today, would be what?

A. Just the average for this area out in this area and I am involved with about 80% of the wells, reserve studies have indicated in excess of a quarter of a million barrels of oil and gas equivalent.

Q. All right. Now, are you talking about recoverability of that volume of gas and oil over the lifetime of the well?

A. Yes, sir. Estimated.

Q. What you've told me about your estimates, Mr. Hollifield, recognizing you can always drill a dry hole, does represent your best and considered judgment as a geologist?

A. Yes, sir.

* * * * * *

Q. All right. Now I had asked you earlier and apparently this is why Mr. Lindsay questioned about three wells out of 400. I had asked you earlier to give me an estimate of what—your best estimate of what production would have been off this well. It's your testimony, just as it was before, that the average wells here are producing approximately a hundred barrels a month? Current wells.

A. In this area, it is very definitely a hundred barrels a day.

* * * * * *

Q. Now, if you assumed a eight year life at a hundred barrels a day, that figures out to be 292,000 barrels?

A. Unfortunately, very few of these wells will produce at the constant hundred. What happens is the best one—the one I'm talking about half a million barrels wells, they come on at 400 barrels a day and decline.

Q. I see. What you need in order to determine—assuming a hundred barrel a day production, you need a reservoir engineer [which he was not] to make an analysis and determine the productive life of the well?

A. That's absolutely correct.

Q. Okay. But your estimate remains as it was, that in the range of 250,000 barrels out of this well on drilling block three?

A. *I won't say out of this well.* I say wells in this area are demonstrated to exceed a quarter of a million barrels on the average. (Emphasis added)

Q. All right.

The most obvious weakness of this witness' testimony was his repeated refusal to give a reserve estimate for the leases in question. *See, e.g., Amoco Prod. Co. v. Alexander, supra; Wes-Tex Land Co. v. Simmons, supra; Payne v. Holmes, supra; Powell v. Danciger Oil & Refining Co. of Texas,* 134 S.W.2d 493 (Tex.Civ.App.1939), *rev'd on other grounds,* 137 Tex. 484, 154 S.W.2d 632 (1941). This expert gave an opinion only for the reserves being carried on the wells in the area without testifying how these reserves related to the lost leases. Furthermore, while recognizing that this expert's opinion was admissible because it was not based solely on hearsay, there was little indication in the record that he based his opinion on much more than hearsay reports from "engineering firms in the area." *Cf. Reed v. Barlow,* 157 S.W.2d 933 (Tex.Civ. App.1941, writ ref'd) (admission of opinion based solely on hearsay and other evidence not in the record is reversible error where testimony went to controlling issue and probably induced a jury finding thereon).

If this were not enough, there are other problems with the sufficiency of appellees' proof of damages. Besides the inadequacies in the reserve estimate for the lost leases and its subsequent use by the second expert in ascertaining the value of the lost leases, the second expert was provided with a lease location several miles away from the leases in question to use in making his value estimates. When the appellant objected prior to the introduction of the second expert's deposition, the appellees admitted that a mistake had been made, but they

argued that since the valuation expert only testified about the value of a lease having the amount of oil and gas reserves provided by another expert and since he did not provide a reserve evaluation or estimate the probability of recovery of oil and gas, the mistake was not fatal. The appellees do not address this problem in their arguments on appeal although one appellee, Brittany Drilling, does assert that the jury's damage finding can be sustained based upon other evidence in the record on the value of the lost leases.[6] Appellees' trial argument would be correct if all the second expert did was use the figures provided by the other expert (assuming those figures were sufficient); however, this was not the case. The valuation expert based his estimates on several factors which depended upon the lease location. For example, the second expert estimated drilling costs based upon recent cost estimates his clients in the area have received for wells they were drilling. He expressly rejected the estimates provided by one of the appellees. The rate of production, the necessity for a lift and the type of lift were other factors in which the second expert relied upon his knowledge of wells in the area to base his opinion. Yet, there is no evidence showing that the area valued is similar to the area in which the lost leases are located. Furthermore, there is testimony that the lenticular formations in this Austin Chalk Region enhanced the possibility that dry holes could be drilled in close proximity to producing wells.

In light of the problems we have discussed regarding the inadequacy of each expert's testimony and the fact that these experts supplied the only evidence upon which the jury could rely in awarding damages, we must hold that the appellees have not proven their damages with reasonable certainty.

 There are two reasons why we must remand the case in its entirety to the trial court regardless of our opinion as to the merits of appellant's other points of error. Because appellant has contested on appeal the issue of its liability in a case involving unliquidated damages, we are precluded, even if we were so inclined, from remanding the case only on the issue of damages.[7] *Turner, Collie & Braden v. Brookhollow, Inc.,* 642 S.W.2d 160 (Tex.1982); Tex.R. Civ.P. 434 (Supp.1982); *see also* Keith, *Texas Rules of Civil Procedure: Comments on the 1975 Amendments,* 39 Tex.B.J. 229 (1976). As for the other parts of this appeal which do not involve appellant's liability for damages or the damage award, we must also include them in our reversal and remand for new trial because the facts and issues are so interwoven with the liability and damage issues that it would make it unfair and impracticable to try the case piecemeal. *See Woods v. Littleton,* 554 S.W.2d 662 (Tex.1977); *International Harvester v. Kesey,* 507 S.W.2d 195 (Tex.1974); *Tower Contracting Company v. Flores,* 157 Tex. 297, 302 S.W.2d 396 (Tex.1957); Tex.R. Civ.P.Ann. 434 (Supp.1982); *see also* Pope and Sheehan, *"Try, Try, Again ... A Proposal to Limit the Scope of New Trials in Texas",* 7 St. Mary's L.J. (1975). Consequently, we reverse the trial court's judgment and remand this cause for a new trial.

---

**6.** The other evidence of value according to Brittany was testimony by the president of County Management about a 161,000 barrel-a-year well which was drilled on one of the lost leases. Brittany is mistaken as to the well location. The record shows that the well was not drilled on one of the lost leases. Rather, it was drilled at a location 1300 feet from the lost leases. Furthermore, assuming arguendo that this is somehow sufficient to show the probability and extent of production at the lost leases, the testimony does not supply evidence of the leases value. There was no testimony on the value

of a lease capable of producing 161,000 barrels a year.

**7.** The appellant argues that there was no evidence and insufficient evidence to support the trial court's implied finding that the failure to convey the Everee White Wade lease caused six million dollars damages to appellees and that the agreement between the parties precluded recovery of damages for the loss of the Vaughn and Oliver leases absent a reassignment or tender of reassignment to appellant's ninety days before the lease expired.