**Mary Drucilla McGill BURNS, et al., Plaintiffs,**

v.

**EXXON CORPORATION, Defendant,**

v.

**FIRST CITY BANK, Trustee, Under Trust Agreement Dated October 19, 1981 For Benefit of Scott McGill, Jr., et al., Intervenor–Plaintiffs,**

v.

**EXXON CORPORATION, Defendant.**

Civ. A. No. C–85–47.

United States District Court,
S.D. Texas,
Corpus Christi Division.

April 11, 1995.

William Key Wilde, Bracewell & Patterson, Houston, TX, for plaintiffs Mary Drucilla McGill Burns, Kathleen McGill Enyart, Alice Ann McGill Erck, Frederick Erck, Alice Adams McGill, Ester D. McGill, Scott

McGill, Francis Claudia McGill Stewart, Linda Jane McGill Weakley.

Richard W. Harrison, Jones Day Reavis & Pogue, Austin, TX, Barry L. Wertz, McGinnis Lockridge & Kilgore, Houston, TX, for defendant Exxon Corp.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

Pending before the Court is Exxon's opposed Motion for Summary Judgment Regarding the Applicability of the Processing Agreement. In 1992, Plaintiffs sought leave to file a cross-motion for partial summary judgment on the same issue. The request was represented to be unopposed, and since then the parties have apparently assumed that the cross-motion is pending. There being no record that leave was ever granted, the Court now ORDERS that leave to file Plaintiffs' Cross–Motion for Partial Summary Judgment is GRANTED.

The central issue is whether the King Ranch Processing Agreement ("Agreement") controls royalty payments on liquid products obtained from gas initially processed at the Kelsey Gas Plant but fractionated at the King Ranch Plant.

Plaintiffs are royalty interest owners under two oil and gas leases executed with Exxon (originally Humble Oil & Refining Co.). On June 20, 1960, Plaintiffs and Exxon, by written agreement, amended the royalty provisions of these leases to require payment of specified royalties on plant products extracted from gas processed at a plant then under construction, the King Ranch Gas Plant. For approximately five years, Exxon processed the gas, fractionated the liquid raw make into individual liquid plant products, and sold the residue gas and liquid plant products at the King Ranch Plant. During these five years, the residue gas from Plaintiffs' leaseholds was marketed in the favorable intrastate market.

On January 29, 1965, Exxon entered into an interstate gas sales contract with Trunkline Gas Company ("Trunkline") obligating Exxon to deliver to Trunkline, for a period of twenty years, gas produced from Plaintiffs' property. In order to avoid commingling gas sold in the interstate and intrastate markets, and thereby subjecting all gas processed at the King Ranch Plant to federal pricing controls, Exxon constructed the Kelsey Gas Plant at a location physically separate from the King Ranch Plant. Plaintiffs facilitated this operational change by granting Exxon a surface lease to construct the Kelsey Plant and granting Trunkline a right-of-way to lay its pipe and buy the gas. *See Joint Pretrial Order, Admission* p. 57. At the Kelsey Plant, gas from Plaintiffs' property underwent absorption and refrigeration, the residue methane gas was sold to Trunkline, and the extracted liquid raw make was stored and then transported by pipeline to the King Ranch Plant. There it was fractionated into individual plant products. The plant products were, at all times, fractionated and sold only at the King Ranch Plant.

■ The Agreement states it is applicable "to any gas produced [from the Plaintiffs' leases] which may be processed in the [King Ranch] plant." *Agreement*, p. 1. Plaintiffs' central contention is that during the relevant period, *gas* from Plaintiffs' leaseholds was being *processed* only at the Kelsey Plant. At the King Ranch Plant, according to Plaintiffs, what was happening was the fractionation of liquids, not the processing of gas. Therefore, they maintain that the Agreement was inapplicable and that they should have been compensated under the original leases. Exxon replies that fractionation is only a part of the processing procedure and that, under Texas law, "gas" includes all its constituent elements, including liquid hydrocarbons recovered therefrom.

■ The crux of the dispute is easier to describe than to resolve. Nevertheless, both parties insist that the Agreement is unambiguous and that the controversy should be resolved as a matter of law. *See Technical Consultant Services v. Lakewood Pipe,* 861 F.2d 1357 (5th Cir.1988) (interpretation of unambiguous contract is question of law). A contract is not ambiguous merely because the parties disagree on the correct interpretation of it. *REO Industries v. Natural Gas Pipeline Co.,* 932 F.2d 447, 453 (5th Cir. 1991), citing, *Sun Oil Co. (Del.) v. Madeley,*

626 S.W.2d 726, 727 (Tex.1981). The entire contract must be examined to give effect to all provisions so that none will be rendered meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). No single provision of the contract can be given controlling effect; rather, all the provisions must be considered with reference to the whole. *Id.*

Article II of the Agreement provides that Exxon "in its discretion may limit or curtail, cease entirely, or recommence its gas processing operations (or any portion of such operations)." Article IV provides that the Agreement shall remain in effect for twenty years. As a whole, therefore, this was an agreement whereby for twenty years the Plaintiffs specifically allowed Exxon the flexibility to conduct some or all of its gas processing operations at the King Ranch Plant. Initially, the parties clearly understood the term "processing" to include not only production of the residue gas but also fractionation of the liquid make into plant products, since that is what was happening at that plant. The Agreement then provided that Exxon could limit, curtail, or cease entirely "any portion of" its gas processing operations. This language clearly suggests that the fractionation of the liquid make was considered part of the processing procedure and not something totally different. The processing of gas is a multiple-phase endeavor:

> The gas, which is carried full stream to the plant, is first sent through the inlet separator which removes the condensate from this full stream gas. After the condensate is removed by the inlet separator, the separator gas is sent to absorption towers where additional liquids are absorbed from such gas. The residue gas remaining after the absorption tower process is then sent through a dehydrator and is delivered to the pipe line company or is returned to the cycling unit by the producers. All liquids recovered, both from the inlet separator and from the absorption tower process, are then further processed to obtain propanes, butanes, motor fuel and other products.

*Freeland v. Sun Oil Co.,* 184 F.Supp. 754, 756 (D.C.La.1959), *aff'd,* 277 F.2d 154 (5th Cir.1960), *cert. denied,* 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed.2d 55 (1960), quoted in Williams and Meyers, 8 OIL AND GAS LAW 955 (Matthew Bender 1992) (definition of "processing plant"). The Court concludes that the fractionation of liquid make was part of the "gas processing operations" within the meaning of the Agreement.

The Court further concludes that the term "gas" includes all constituent elements contained therein, including liquid hydrocarbons recovered from the gas stream. *Sowell v. Natural Gas Pipeline Co.,* 789 F.2d 1151, 1157 (5th Cir.1986); *Lone Star Gas Co. v. Stine,* 41 S.W.2d 48, 49 (Tex.Comm'n App. 1931, judgment adopted). It is clear from the opening preamble of the Agreement that the parties were contracting "with respect to the use of gas produced by (Exxon) from the lands (leased from Plaintiffs)." The Court rejects the narrow view that the parties intended for "gas" to mean only the gaseous state of the substance. "Gas" coming out of a reservoir takes a variety of forms throughout the processing procedure, but all of the components in a broad sense are parts of the "gas" produced from the leasehold estate.

Plaintiffs point specifically to the opening paragraph of Article III of the Agreement which provides "that there will or may be three types of gas entering the plant," namely, nonassociated or associated gas taken into the plant without lease separation, nonassociated or associated gas taken into the plant after lease separation, and casinghead gas or gas produced with oil. The Plaintiffs say that none of these types of gas entered the King Ranch Plant after 1965 and, therefore, the Agreement ceased to apply, even though all plant products were still produced at the King Ranch Plant.

While there is a superficial appeal to this argument, the Court concludes that it ultimately must fail in light of the structure and purpose of the Agreement as a whole. Obviously when the parties first negotiated the agreement, they contemplated that the types of gas described in Article III would be directly entering the plant, which was the case for several years. However, it is also true, as noted earlier, that this was a twenty-year agreement giving Exxon the flexibility to cease or curtail any portion of the entire gas processing operation without any stipula-

tion that a termination of the Agreement would result. More importantly, the overall purpose of the Agreement was to establish royalties on the sale of plant products produced at the plant. The purpose in describing the types of gas that might enter the plant was to describe how those types would affect the royalties. Thus, the royalty on plant products extracted from gas delivered without lease separation was to be calculated differently than the royalty on plant products extracted from gas "run through a separator on the lease." Agreement, Article III, Paragraph 2. It is undisputed that all the gas produced from Plaintiffs' leases was separated on the lease before processing, and that Exxon paid the royalty on the plant products on that basis.

The Court concludes that the parties entered into a twenty-year agreement intended to fix the manner of paying royalties on plant products resulting from the processing of gas extracted from Plaintiffs' lands. The Agreement allowed Exxon the flexibility to do all or some of the processing at the King Ranch Plant. Fractionation of liquid make is an integral part of the overall processing of the gas. Exxon continued to do that portion of the processing at the King Ranch Plant even after earlier stages of the processing were moved to the Kelsey Plant. The Agreement provided for royalties on plant products sold at the King Ranch Plant. Those products were the result of processing gas extracted from Plaintiffs' lands. The 1960 Agreement applies. Defendant's Motion for Partial Summary Judgment is GRANTED. Plaintiffs' Cross–Motion for Summary Judgment is DENIED.

The parties are DIRECTED to immediately confer and advise the Court no later than April 28, 1995 as to what, if anything, remains to be done in this case. If nothing remains, counsel for Exxon shall draft and file a proposed judgment after submitting it to opposing counsel for approval as to form.